Mark and Elizabeth WISNISKI t/d/b/a
Saturn Surplus, Appellants,

v.

BROWN & BROWN INS. CO. OF PA,
Donald Blood and Will Rineer, EMC
Ins. Co. and Scott W. Ahlstrom, Appel-
lees.

Mark and Elizabeth Wisniski t/d/b/a
Saturn Surplus, Appellees,

v.

Brown & Brown Ins. Co. of PA, Donald
Blood and Will Rineer, EMC Ins. Co.
and Scott W. Ahlstrom, Appellants.

Superior Court of Pennsylvania.

Argued Feb. 10, 2004.

Filed Aug. 15, 2006.

Timothy Nieman, Harrisburg, and Lori Miller, Blue Bell, for Wisniski.

Michele J. Thorp, Harrisburg, for Brown & Brown.

BEFORE: LALLY–GREEN, GANTMAN, and CAVANAUGH,* JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 This case is on remand from our Supreme Court. We must consider whether insurance brokers have a duty to inspect a business property for purposes of offering flood insurance, using the framework set forth in *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000). Using that framework, we conclude that no such duty exists. We therefore affirm the trial court's grant of summary judgment.

¶ 2 This case initially arose as an appeal by Plaintiffs/Appellants, Mark and Elizabeth Wisniski, t/d/b/a Saturn Surplus ("Saturn Surplus"), from the trial court's order dated April 18, 2003, granting summary judgment to Defendants/Appellees, Brown & Brown Insurance Co. of Pa. Inc., Donald Blood, and Will Rineer (collectively, "the Brown Agency"). The trial court summarized the factual and procedural background of the case as follows:

> Presently before this court are two Motions for Summary Judgment filed by Defendants Brown & Brown Insurance

Co. of PA, Inc., Donald Blood and Will Rineer, collectively the "Brown Agency," and Defendants EMC Insurance Companies and Scott W. Ahlstrom, collectively "EMC." For the reasons set forth below, Defendant Brown Agency's Motion for Summary Judgment is granted and Defendant EMC's Motion for Summary Judgment is denied.

The origin of this case dates back to an incident that occurred on September 7, 1999, wherein the plaintiffs' business property, Saturn Surplus, a military surplus supply store, was flooded. In the Complaint filed June 1, 2000, plaintiffs allege that they contacted the Brown Agency in 1994 through its agents, Donald Blood, an account executive and Will Rineer, a customer service representative, to obtain commercial business insurance for their recently purchased property located at 3284 Route 147, Millersburg, Dauphin County. The parties allegedly had a pre-existing relationship dating back to 1991 and plaintiffs contend that they informed Defendants Blood and Rineer that they wanted complete coverage for this new property. Plaintiffs claim that Defendants Blood and Rineer requested information about the building, and recommended commercial property and liability coverage, but did not inspect the property before selling the policy to plaintiffs. Thereafter, in September 1994, plaintiffs purchased a commercial insurance policy from the Brown Agency, which was placed with Defendant EMC.

Plaintiffs claim that the defendants did not inform them that their insurance plan contained an exclusion for property damage caused by a flood nor that flood insurance was available for an additional premium. From 1994 through 1998, plaintiffs renewed the commercial insurance policy. Sometime during 1995, De-

fendant EMC directed its employee, Scott Ahlstrom, to inspect plaintiffs' property to perform a risk analysis with respect to the insurance coverage. Plaintiffs claim that during the inspection Ahlstrom identified various risks and made recommendations to plaintiffs to minimize those risks. Additionally, Ahlstrom observed that the property was located directly across the highway from the Susquehanna River and that a stream traversed plaintiffs' property underneath [sic] the building located on the property; however, Ahlstrom did not make a recommendation to plaintiffs that they obtain flood insurance coverage.

On September 7, 1999, plaintiffs allegedly suffered damages exceeding $375,000.00 to the building and its contents when the stream traversing their property overflowed its banks and flooded plaintiffs' building. Plaintiffs notified Defendant Brown Agency of the loss, but were informed that there was no coverage for flood damage. Plaintiffs commenced the instant suit asserting that defendants breached a duty to "exercise the skill and knowledge normally possessed by members of the insurance profession in good standing in similar communities." See Restatement (Second) [of Torts] 2d § 299A. Essentially, plaintiffs contend that all of the named defendants breached their duty by allegedly failing to investigate the plaintiffs' insurance coverage needs, inspect the plaintiffs' property, inform the plaintiffs that flood insurance was not included in the policy, and recommend that the plaintiffs purchase flood insurance.

Trial Court Opinion, 4/18/2003, at 1–3.

¶ 3 As noted above, the Brown Agency and EMC filed motions for summary judg-ment. Saturn Surplus filed responses to these motions. Saturn Surplus presented evidence from the defendants themselves and from an insurance professional that the defendants' conduct fell below the applicable standard of care. On April 18, 2003, the trial court granted the Brown Agency's motion, but denied EMC's motion.

¶ 4 Saturn Surplus and EMC both appealed. In a published Opinion filed on June 7, 2004, this Court quashed EMC's appeal, and heard Saturn Surplus's appeal on the merits. *Wisniski v. Brown & Brown Ins. Co. of Pa.*, 852 A.2d 1206, 1209–1211 (Pa.Super.2004).

¶ 5 On March 2, 2005, our Supreme Court granted the Brown Agency's petition for allowance of appeal. On December 21, 2005, our Supreme Court issued a *per curiam* order vacating this Court's decision and remanding "for reconsideration of whether a duty exists by applying the five-prong test as set forth in *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000), and for an opinion in support thereof." *Wisniski v. Brown & Brown Ins. Co. of Pa.*, 585 Pa. 44, 887 A.2d 1238 (2005). After the Supreme Court's remand, the parties and *amici* filed supplemental briefs. We are now in a position to address the Supreme Court's remand directive.

¶ 6 Saturn Surplus raises a negligence claim against the Brown Agency.[1] "It is axiomatic that in order to maintain a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct; that the defendant breached that duty; that such

---

1. Saturn Surplus did not raise any other claims, such as breach of contract, fraud, or breach of fiduciary duty.

breach caused the injury in question; and actual loss or damage." *Phillips v. Cricket Lighters,* 576 Pa. 644, 841 A.2d 1000, 1008 (2003) (citation omitted).

¶ 7 "The initial element in any negligence cause of action is the first: that the defendant owes a duty of care to the plaintiff. The existence of a duty is a question of law for the court to decide. In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another. This concept is rooted in public policy." *R.W. v. Manzek,* 585 Pa. 335, 888 A.2d 740, 746 (2005) (citations omitted).

¶ 8 In *Althaus,* our Supreme Court set forth both the general principles and a five-factor test for determining whether a duty exists:

In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered[.] To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves

a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

Thus, the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus,* 756 A.2d at 1168–1169 (citations omitted). We will now address each of those factors in turn.

### 1. *The relationship between the parties*

¶ 9 First, we examine the nature of the relationship between the Brown Agency and Saturn Surplus.[2] In *Basile v. H & R Block, Inc.,* 563 Pa. 359, 761 A.2d 1115

---

**2.** It is important to bear in mind that the insurance company that issued the policy, EMC, is not a party to this appeal. Again, the trial court **denied** EMC's motion for summary judgment. This Court and our Supreme

Court did not review that decision. Saturn Surplus's action against EMC will presumably continue in the trial court after this appeal involving the Brown Agency is complete.

(2000), our Supreme Court recognized three categories of relationships between contracting parties. The first is an ordinary, arm's-length relationship. The second is an agency relationship and the third is a confidential relationship. *Id.* at 1120.

■■ ¶ 10 Regarding the agency relationship, "[t]he three basic elements of agency are: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Id.* (citations omitted). The key and distinctive feature of an agency relationship is the agent's power to affect the legal relationship of the principal with third parties: *e.g.,* entering into contracts for them, buying or selling goods for them, or subjecting the principal to potential tort liability. *Id.*

■ ¶ 11 As the saying goes, "with great power comes great responsibility": the power of an agent to bind the principal brings with it a concomitant fiduciary duty to act with loyalty and the utmost good faith. *Id.* On the other hand, one important caveat is that "the special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability **to actually bind the principal or alter the principal's legal relations.**" *Id.* (emphasis added).

¶ 12 For example, in *Basile,* our Supreme Court held that there was no principal/agent relationship between H & R Block and its customers in the context of Block's offering a "Rapid Refund" program. Under that program, taxpayers had the option of securing a refund anticipation loan (RAL) after Block prepared

their taxes. Block offered, marketed, and facilitated RAL's, but the choice to enter into the RAL remained with the customer. *Id.* at 1121. The Court focused on the fact that Block did not have the power to enter into an RAL on behalf of the customer. *Id.* Indeed, the Court noted that Block did not even have an agency relationship with respect to tax preparation:

> Block had no more authority to alter the legal relationship between its customers and the IRS than it had to bind those customers to a loan agreement with Mellon Bank. Block could not file a tax return without the customer's authorization and signature, nor could Block obligate the customer to pay any amount of income tax to the IRS without authorization and consent in the form of the customer's signature on the return. Therefore, no agency relationship existed between Block and its customers.

*Id.* at 1122.

■ ¶ 13 The third category is a confidential relationship. This relationship can arise even in the absence of an agency relationship. *Id.* at 1121. "A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." *eToll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10, 23 (Pa.Super.2002). "This does not mean, however, that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party. The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side." *Id.* (citations

and emphasis omitted).[3]

¶ 14 With these distinctions in mind, we turn to the facts of the instant case. It is not seriously disputed that the Brown Agency acted as an insurance **broker,** not an insurance agent. *Amici* highlighted the difference between the two terms as follows:

[An 'insurance broker' is] one who acts as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and upon securing an order, placing it with a company selected by the insured or with a company selected by himself or herself; whereas an 'insurance agent' is one who represents an insurer under an employment by it. A broker is, in essence, employed in each instance as a special agent for a single purpose, while the very definition of an agent indicates an ongoing and continuous relationship. Since many insureds deal with the same broker for long periods of time, it is, in most cases, the continuity of the agency relationship that differs from the broker relationship; brokers and insureds are ordinarily involved in what can be viewed as a series of discrete transactions, while agents and insurers tend to be under some duty to each other during the entire length of the relationship.

Brief of Amici at 10, *quoting Couch on Insurance,* § 45:1 (3d ed.2005); *see also* 31 Pa.Code § 37.1 (drawing substantially the same distinction between "agent" and "broker").[4]

¶ 15 The record reflects that the Brown Agency was a broker for Saturn Surplus. The Brown Agency was not employed exclusively by any one insurance company. Rather, the Brown Agency would act as a middleman and use its discretion to select an insurance company/policy for Saturn Surplus. In doing so, the Brown Agency would also offer its advice on the scope of coverage to some extent. The record reflects that Saturn Surplus put trust in the Brown Agency's judgment about the scope of coverage. On the other hand, the Brown Agency never had the power to bind Saturn Surplus any particular insurance contract. Rather, that decision remained exclusively with Saturn Surplus. Accordingly, we conclude that there was no principal/agent relationship between Saturn Surplus and the Brown Agency. *See Basile.*

¶ 16 The question of whether or not a confidential relationship exists between the parties is intensely fact-specific. *See generally Porreco v. Porreco,* 571 Pa. 61, 811 A.2d 566 (2002); *Basile, supra; Makozy v. Makozy,* 874 A.2d 1160 (Pa.Super.2005), *appeal denied,* 891 A.2d 733 (Pa.2005); *Owens v. Mazzei,* 847 A.2d 700 (Pa.Super.2004). We observe, however, that clients will bring various degrees of sophistication and initiative to their relationship with a broker. While one client may unthinkingly accept any recommendation and place a great deal of trust in a broker, another client may be a "picky shopper" and second-guess the broker's every decision. We certainly cannot conclude as a matter of law that the relationship between an insurance broker and a client is always (or even generally) confidential. To the contrary, we will presume

---

**3.** Of course, it is possible for a broker to enter into a confidential relationship with a client. *See Paone v. Dean Witter Reynolds, Inc.,* 789 A.2d 221 (Pa.Super.2001), *appeal denied,* 570 Pa. 687, 808 A.2d 572 (2002).

**4.** Nothing in our analysis should preclude the use of the term "broker" to carry a different meaning in different contexts, if circumstances warrant.

that, for the great majority of broker-client interactions, the relationship will not be so extremely one-sided as to be confidential. *See eToll; Weisblatt v. Minnesota Mut. Life Ins. Co.,* 4 F.Supp.2d 371, 381–382 (E.D.Pa.1998). Moreover, the burden for proving the existence of a confidential relationship is on the party making that claim. *See id.; Basile v. H & R Block,* 777 A.2d 95 (Pa.Super.2001). We must also bear in mind that we are determining whether a duty of care exists for ordinary negligence purposes, not for any other purposes.[5] Thus, we conclude that for ordinary negligence purposes, the relationship between an insurance broker and client is an arm's-length business relationship.[6]

5. Ultimately, we need not address the specific question of whether a confidential relationship existed between Saturn Surplus and the Brown Agency, because Saturn Surplus did not raise any claim for breach of fiduciary duty.

6. Indeed, Pennsylvania courts have often stressed that the insured has both the capacity and the duty to inquire about the scope of insurance coverage, rather than rely on "hand holding and substituted judgment." *See Kilmore v. Erie Ins. Co.,* 407 Pa.Super. 245, 595 A.2d 623, 626 (1991) (while an insurer has a duty to explain in good faith the coverage that is provided, the insurer need not warn the insured about every scenario in which coverage might not be provided), *appeal denied,* 529 Pa. 664, 604 A.2d 1030 (1992); *Treski v. Kemper Nat'l Ins. Co.,* 449 Pa.Super. 620, 674 A.2d 1106, 1114–1115 (1996) (*citing Kilmore* with approval).

Other state courts have adopted a similar analysis. For example, in *L.C.E.L. Collectibles v. American Ins. Co.,* 228 A.D.2d 196, 643 N.Y.S.2d 102 (N.Y.App. Div. 1st Dep't 1996), the Supreme Court of New York, Appellate Division, held that an independent insurance agency "had no duty to recommend flood insurance or to inspect the location of plaintiff's property to determine whether it was near a flood plain or swamp, where plaintiff neither specifically requested such insurance nor communicated the area's susceptibility to flood damage." This analysis

## 2. The social utility of the actor's conduct

¶ 17 There is significant social utility in inspecting a property before advising a client about its insurance needs. An inspection may help the broker to better understand the risks that a client faces, the value of the assets to be insured, and the overall scope of appropriate coverage. Because a broker has expertise in the insurance industry that the client presumably does not, an inspection would likely help to give the client the full measure of the broker's expertise.[7] On the other hand, we must acknowledge that insureds can also inspect their own property and come to their own reasonable conclusions about the type and scope of insurance coverage they need.[8] We also note that

strongly suggests that a broker's relationship with the insured is ordinarily an arm's length transaction, rather than one which is inherently marked by extreme dependence and trust. *Accord Houck v. State Farm Fire & Cas. Ins. Co.,* 366 S.C. 7, 620 S.E.2d 326 (S.C. 2005) (also setting forth background information about the nature of flood insurance).

7. Indeed, to the extent that inspections lead to greater coverage, they will presumably lead to higher premiums as well. In other words, it may be in the broker's own best interest to inspect the client's property.

8. We recognize that in the instant case, Mr. Wisniski, a man with an 11th-grade education, displayed a limited understanding of insurance coverage. In his deposition, Mr. Wisniski testified that he asked for (and believed he had) "full coverage," which he defined as "basically the building is covered for whatever is going to happen to it." N.T., 11/5/2001, at 14. When asked if he knew that the policy had exclusions, Mr. Wisniski replied: "I looked through the policy, but as you're looking through a policy, I'm not a lawyer. I can't read it. Never did understand a lot of the, you know, policy. I tried to read parts of it. I did read the front pages of it to get what the dollar value coverages are." *Id.* at 14–15. Mr. Wisniski stated that he did not understand insurance policies, and that one would have to be a lawyer to understand

brokers are not necessarily specialists in loss prevention or property inspection, so the social utility of a broker's inspection may be limited.

### 3. *The nature of the risk imposed and foreseeability of the harm incurred*

¶ 18 When determining if a person has a duty to take a particular action, courts must balance the social utility of that action against the extent and foreseeability of the harm that would result if the person did **not** take that action. *Althaus*, 756 A.2d at 1170. "Regarding the third factor, a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R. W.*, 888 A.2d at 747.

¶ 19 Here, the nature of the risk is that an accident or occurrence will take place, causing damage to the insured's property, for which insurance coverage does not exist because the broker failed to inspect the property and/or to offer an appropriate type or level of insurance.[9] That risk could result in huge uninsured property-damage losses. Of course, it is difficult to determine in the abstract how **foreseeable** such a risk actually is. As the *amici* persuasively argue:

> [R]isk is the very nature of insurance. As stated earlier, individuals take an intellectual gamble when purchasing in-

surance as they weigh the expense of purchasing insurance versus the amount of coverage they purchase. Insurance against loss does not mean that the industry is a 100% guarantor of protection against loss.

Brief of *Amici* at 15–16, *citing Farmers Ins. Co. v. McCarthy*, 871 S.W.2d 82, 86 (Mo.App.1994). In our view, the risk/utility analysis does not weigh strongly in favor of either party's position.

### 4. *The consequences of imposing a duty upon the actor*

¶ 20 It very well may be a wise and sound business practice for a broker to inspect premises and recommend insurance based on that inspection. We are faced, however, with the question of whether brokers have a legal **duty** to do so. Under *Althaus*, one factor is the consequences of imposing such a legal duty.

¶ 21 In our view, imposing a duty would be onerous for many reasons. First, the time and expense of inspecting every property may very well outweigh the relative value of an inspection, particularly for low-value properties. Second, a knowledgeable insured may be able to provide all the information necessary for adequate coverage in an interview, without the need for a personal inspection. Third, we stress that we are concerned with extending this duty

---

them. N.T., 11/12/2001, at 68. He did not consult a lawyer about his coverage. *Id.* Moreover, he did not ask anyone before the incident about whether he would be covered in the event of water damage. *Id.* at 68. Mr. Wisniski testified that he knew about the stream running under a portion of his building. N.T., 11/5/2001, at 27 ("I walked around the property and seeing it. It's right by the back door. It's very hard to miss.") He was also aware of a flood that took place in the area in 1972. N.T., 11/12/2001, at 50. Mr. Wisniski did not believe there was any "cause for alarm" because the building is quite large and had been standing since the 1950's. N.T., 11/5/2001, at 27. Moreover, when it is

not raining, there is very little water running through the stream. *Id.* Mr. Wisniski did not specifically talk about flood insurance with Mr. Blood of the Brown Agency. *Id.* at 14. He did not inform Mr. Blood about the stream. N.T., 11/12/2001, at 48.

9. This analysis presumes that the insured would have accepted and paid an additional premium for the insurance that the broker failed to offer. Of course, given the benefit of hindsight, it is quite easy for an insured to make this claim. It is also difficult to disprove.

to **brokers**, not insurance companies or agents. While brokers may provide a variety of services, they are primarily in the business of acting as an intermediary between insurance companies and clients. Some brokers may not have the expertise to conduct a thorough inspection, and instead may rely on loss control experts at the insurance companies themselves to assess risks. Fourth, it is far from clear where the duty to inspect would end. If this Court recognized a duty of brokers to inspect business properties, it is difficult to see a principled basis for failing to extend that duty to homes, land, cars, boats, and other insurable items. Fifth, imposing a duty to inspect would unreasonably diminish the insured's own responsibility to ascertain and ask for appropriate coverage. Finally, we are persuaded by the position set forth by the Missouri Court of Appeals:

> [B]y creating such a duty insureds would have the opportunity to seek coverage for a loss after it occurred merely by asserting that they would have bought additional coverage if it had been offered. This turns the entire theory of insurance on its ear as individuals, in theory, take an 'intellectual gamble' when purchasing insurance as they weigh the expense of insurance versus the amount of coverage that they purchase. Allowing insureds to seek coverage, post-occurrence, allows them to completely circumvent this risk.

*Farmers Ins. Co.*, 871 S.W.2d at 86 (citation omitted). The fourth factor weighs heavily against recognizing a duty.

5. *The overall public interest in the proposed solution*

¶ 22 There does not appear to be a strong overall public interest in requiring insurance brokers to inspect business premises and advise clients based on that inspection.[10] We note that the insurance industry is regulated to a great degree by statute. To the extent that the Legislature has spoken on this topic, it has undertaken to **exempt** insurers from negligence liability. *See* Insurance Consultation Services Exemption Act, 40 P.S. § 1841 *et seq.; Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1223 (2002) ("Where our lawmakers have so thoroughly considered the statewide application and implications of a subject, this Court must refrain from imposing additional requirements upon that legislation").

¶ 23 On balance, the *Althaus* factors do not weigh in favor of recognizing a broker's duty to inspect business premises and advise clients based on that inspection. Accordingly, we hold that no such duty exists as a matter of law. In the absence of a duty of care, the Brown Agency cannot be liable for negligence. We therefore affirm the trial court's grant of summary judgment in favor of the Brown Agency.

¶ 24 Order affirmed. Jurisdiction relinquished.

---

10. This is particularly true with respect to flood insurance. In general, and particularly after Hurricanes Ivan and Katrina, people are aware of the existence of flood insurance. Based on historical flood patterns and the geography of the area in which they live, people are able to make an educated decision about whether and to what extent they need flood insurance.