**COMMERCE BANK/PENNSYLVANIA,**
Appellant

v.

**FIRST UNION NATIONAL BANK,**
Corestates Bank N.A. and Edward
Stillman, Appellees.

Superior Court of Pennsylvania.

Argued March 7, 2006.
Filed Oct. 31, 2006.

Frank Murphy, Philadelphia, for appellant.

Daniel T. Fitch, Philadelphia, for First Union, appellee.

Leo Gibbons, W. Chester, for Stillman, appellee.

BEFORE: LALLY–GREEN, KLEIN, and GANTMAN, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant, Commerce Bank/Pennsylvania, N.A., appeals from two orders of the Court of Common Pleas of Chester County. First, Appellant appeals from the order dated January 20, 2004, granting summary judgment in favor of First Union Bank and Corestates Bank, N.A., now known as Wachovia Bank, National Association (collectively, "First Union"). Appellant also appeals from the order dated October 20, 2004, granting a Petition to Enforce Settlement Agreement filed by Edward Stillman. We affirm.

¶ 2 The factual and procedural history of the case is as follows. Stillman was a partner in a company called CF Foods. Appellant alleged that throughout 1998, First Union allowed CF Foods to operate a check-kiting scheme using a First Union bank account. Appellant also alleged that First Union knew or should have known of the check-kiting operation, and yet did not issue a Suspicious Activity Report (SAR), required under federal law, to help stop it. Finally, Appellant alleged that First Union engaged in fraud in order to keep the account active, because First Union feared that closing the account would result in multi-million-dollar losses.

¶ 3 In March 1999, CF Foods approached Appellant for banking services. Appellant asked CF Foods to provide a banking history. CF Foods provided information from its still-active account at First Union. Appellant then allowed CF Foods to open an account. Within weeks, Appellant noticed that CF Foods was using the new account to run another check-kiting scheme. Appellant issued an SAR and took other action to limit activity on the account. Shortly thereafter, the

check-kiting scheme, and CF Foods as a whole, collapsed. Appellant suffered over $900,000.00 in losses as a result of CF Foods' check-kiting activity on Appellant's account.

¶ 4 On November 11, 2000, Appellant filed suit against First Union for negligence, civil conspiracy, unjust enrichment, and constructive trust.[1] On January 20, 2004, the trial court entered summary judgment in favor of First Union. The trial court reasoned that: (1) the negligence claim failed because Appellant could not establish duty or proximate cause; (2) the conspiracy claim failed because Appellant could not establish "that First Union conspired with C.F. Foods to retain funds belonging to [Appellant]"; (3) the unjust enrichment claim failed because Appellant could not establish that First Union unjustly retained any of Appellant's funds; and (4) the constructive trust claim necessarily failed because the unjust enrichment claim lacked merit. Trial Court Order, 1/20/2004, at n. 1.

¶ 5 During the course of this litigation, Appellant filed suit against Stillman. The trial court consolidated Appellant's cases against First Union and Stillman. Appellant and Stillman entered into settlement negotiations in April and May of 2003. The negotiations resulted in a draft settlement agreement. On June 18, 2004, Stillman filed a Petition to Enforce the Settlement Agreement. The trial court granted this petition on October 20, 2004. The trial court reasoned that Appellant and Stillman came to a "meeting of the minds" on all essential settlement terms, even if they never actually signed an agreement memorializing those terms. Trial Court

Order, 10/20/2004, at n. 1. This timely appeal followed.[2]

¶ 6 Appellant raises the following issues on appeal:

1. Did the trial court err as a matter of law in granting summary judgment in favor of [First Union] on:

a. Appellant's negligence claim where the law imposes liability on a bank engaging in fraud, which fraud is the cause of injury to another bank, and where there were genuine issues of material fact as to i.) whether or not [First Union] was negligent or committed fraud and ii.) whether or not there was a causal connection between [First Union's] fraud and the injury suffered by Appellant where the record established that [First Union] deliberately facilitated the ongoing criminal check-kiting scheme being run by its customer, thereby causing a direct, substantial financial loss to Appellant? And;

b. Appellant's civil conspiracy, unjust enrichment, and constructive trust claims where there were genuine issues of material fact because the record established i.) that [First Union] and its co-conspirators maintained the concealment of a check-kiting scheme and fraud, thereby shifting its own fourteen million dollar loss to and retaining the funds of Appellant and ii.) that Appellant conferred a benefit on [First Union] by suffering the loss that would otherwise have been suffered by [First Union]?

---

1. Appellant also filed suit for conversion. The trial court dismissed this claim, and Appellant does not challenge that ruling.

2. The trial court did not order Appellant to file a concise statement of matters complained of on appeal under Pa.R.A.P.1925. Appellant did not volunteer a concise statement, and the trial court did not issue a Rule 1925 opinion.

2. Did the trial court err as a matter of law in granting [Stillman's] Petition to Enforce the Settlement Agreement where the clear, unambiguous terms of the agreement and the offer of [Stillman], as well as the evidence of the parties' intent, demonstrated that the agreement required the signatures of both parties in order to be enforceable and the agreement did not have both parties' signatures?

Appellant's Brief at 5.

A. *The Appeal Involving First Union*

¶ 7 We will begin with the appeal involving First Union. We note that Appellant appeals from a summary judgment order. Our Supreme Court recently set forth the relevant legal standards as follows:

> The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.

*Swords v. Harleysville Ins. Cos.*, 584 Pa. 382, 883 A.2d 562, 566–567 (2005) (citations omitted). We will address the merits of each of Appellant's causes of action against First Union in order.

1. *Negligence*

██ ¶ 8 "It is axiomatic that in order to maintain a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct; that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage." *Wisniski v. Brown & Brown Ins. Co.*, 2006 PA Super 216, ¶ 6, 906 A.2d 571, *quoting Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003). In *Wisniski*, this Court recently reviewed Supreme Court jurisprudence regarding the existence of a duty, as follows:

> "The existence of a duty is a question of law for the court to decide. In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another. This concept is rooted in public policy." *R.W. v. Manzek*, 585 Pa. 335, 888 A.2d 740, 746 (Pa.2005) (citations omitted).

> In *Althaus [v. Cohen*, [562 Pa. 547] 756 A.2d 1166 (Pa.2000) ], our Supreme Court set forth both the general principles and a five-factor test for determining whether a duty exists:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered[.] To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

Thus, the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus*, 756 A.2d at 1168–1169 (citations omitted).

*Wisniski*, 2006 PA Super 216 at ¶¶ 7–8, 906 A.2d 571.

■ ¶ 9 Again, the essential facts of this case, according to Appellant, are the following. CF Foods used its pre-existing account history with First Union to induce Appellant to open a CF Foods account at Appellant's bank. CF Foods then used its account at Appellant's bank as a base for a check-kiting operation which caused economic harm to Appellant. According to Appellant, a bank such as First Union has a duty to take action against a client's bank account when the bank suspects fraud, in order to protect a third-party bank such as Appellant from future similar fraudulent conduct. Because this is a case of first impression, we will begin by examining the *Althaus* factors to determine whether a duty exists.

a. *The relationship between the parties*

■ ¶ 10 "[D]uty is predicated on the relationship that exists between the parties at the relevant time." *R.W.*, 888 A.2d at 747. Aside from the fact that First Union and Appellant are both banks, there was no discernible relationship between them at the relevant time. First Union did not stand in a confidential relationship or an agency relationship with Appellant. *See Banco Urquijo, S.A. v. Signet Bank*, 861 F.Supp. 1220, 1249 (M.D.Pa.1994). The record further reflects that the parties did not even have a direct contractual relationship with each other. *Compare Wisniski*, 2006 PA Super 216 at ¶ 16, 906 A.2d 571 (relationship between insurance broker and client was an arm's-length business relationship). Of course, both parties are subject to general banking laws and regulations governing their conduct with each other. Appellant, however, has cited no case or statute indicating that banks generally stand in a special position of respect or trust with each other, so as to impose a

special duty of care. Because the parties were essentially strangers to each other at the relevant time, this factor does not support a finding of a duty.[3]

b. *The social utility of the actor's conduct*

¶ 11 There is high social utility in a bank taking action against a client's account when it suspects fraud or check-kiting. Such action could discourage the client from continuing this conduct, and thereby help to protect third parties and minimize losses. This factor supports a finding of a duty.

c. *The nature of the risk and the foreseeability of the harm incurred*

¶ 12 "Regarding the third factor, duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R.W.*, 888 A.2d at 747. Generally, our Courts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances. *See Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623 (1999); *Hospodar v. Schick*, 885 A.2d 986 (Pa.Super.2005), *appeal denied*, 588 Pa. 765, 903 A.2d 1234, 2006 Pa.Lexis 1389 (Pa. Aug. 1, 2006).[4]

¶ 13 As noted above, in general, taking action against a client's account may prevent some types of harm to third parties. On the other hand, the nature of the risk and the foreseeability of harm **in this specific case** are vague and attenuated. While it may be easy in hindsight to trace Appellant's losses back to some act or omission by First Union, this is not the test. The test is whether the harm to Appellant was **foreseeable** in the first instance.

¶ 14 Here, Appellant fails to explain how it was foreseeable that any act by First Union would lead to Appellant's harm. For example, Appellant has failed to demonstrate how First Union could foresee: (1) that CF Foods would use the First Union account to seek out another bank to victimize; or (2) that Appellant would allow CF Foods to open an account based on one prior banking relationship with First Union. While Appellant mentioned the foreseeability factor in its brief, Appellant did not develop any argument on this point. *See* Appellant's Brief at 34–35. This factor does not support a finding of a duty.

d. *The consequences of imposing a duty upon the actor*

¶ 15 The consequences of imposing a duty would prove onerous. Under Appellant's theory, a bank could be held liable simply for keeping a suspicious account active, even if the bank took no action directed at any other bank or individual, simply because the client could use that account elsewhere as proof of a legitimate banking history. We decline to make banks the guarantors of their clients' trustworthiness. Moreover, imposing liability would inevitably force banks to close or restrict the clients' accounts on the least degree of suspicion, thereby alienating

---

3. We recognize, of course, that a negligence claim may be viable even in the absence of a special or contractual relationship. *See Bilt–Rite Contrs. v. Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 282 (2005).

4. *Compare R.W.*, 888 A.2d at 750–752 (negligence action filed by parents of young girl who was attacked while selling goods for a school fundraiser survived preliminary objections, where the parents alleged sufficient specific facts demonstrating that the fundraising company foresaw the risk of enticing children to fundraise in public).

their customers, in order to avoid unspecified liability. This factor strongly weighs against a finding of a duty.

e. *The overall public interest in the proposed solution*

■ ¶ 16 There does not appear to be a great public interest in Appellant's proposed solution. First, we note that the banking industry is well-regulated. Federal law does provide a process by which banks can issue a Suspicious Activity Report (SAR) on their customers' accounts.[5] On the other hand, a bank's failure to issue an SAR does not create a private right of action. *B.E.L.T., Inc. v. Wachovia Corp.,* 403 F.3d 474, 476 (7th Cir. Ill.2005). We are reluctant to impose liability where federal and state banking laws do not. *See Wisniski,* 2006 PA Super 216 ¶ 22, 906 A.2d 571.

■ ¶ 17 We also note that our decision is consistent with what one federal court has described as the prevailing "general rule": namely, that banks do not have a duty to inform other banks of their suspicion of check-kiting activity. *See Frost Nat'l Bank v. Midwest Autohaus, Inc.,* 241 F.3d 862 (7th Cir. Ill.2001) (collecting cases). Under this general rule, no duty exists because banks deal with each other at arm's length, and each bank has its own means and responsibility to protect itself from check-kiting. *Id.* at 874; *see also B.E.L.T.,* 403 F.3d at 476–477.

¶ 18 The *Frost Nat'l Bank* Court noted four instances where the general rule may not apply: "(1) where a fiduciary or confidential relationship exists; (2) where a contractual relationship exists; (3) where there is a duty created by law; and (4) where there was fraud or misrepresentation by the defendant bank." *Id.; accord Wells Fargo Bank, N.A. v. Citizens Bank of Tex., N.A.,* 181 S.W.3d 790, 804–805 (Tex.App.2005). Here, the record does not reflect that any of the four exceptions applies. While Appellant spends a great deal of its brief accusing First Union of fraud, apparently none of that fraud was directed at Appellant itself. Indeed, we note that Appellant did not bring a cause of action for fraud against First Union. In any event, Appellant does not accuse First Union of making false or misleading statements **to Appellant.** Rather, Appellant simply argues that First Union kept the CF Foods account active. CF Foods used that active account as a banking history reference in order to induce Appellant to open an account for CF Foods. This is not to say, however, that First Union misrepresented the status of the account, or vouched for the integrity of CF Foods in any way. Appellant's claim of fraud is too attenuated and weak to support any exception to the general rule.[6]

¶ 19 For the reasons set forth above, we conclude that Appellant's claim of negligence fails as a matter of law because Appellant has failed to demonstrate that

**5.** Pursuant to 12 C.F.R. § 21.11(c), national banks such as First Union are required to file a SAR with the Financial Crimes Enforcement Network (FinCEN) of the Department of the Treasury when they suspect fraud or criminal activity as set forth in the regulation. SARs are confidential, in the sense that member banks may not disclose the existence of a SAR to third parties, even if subpoenaed to do so. 12 C.F.R. § 21.11(k). Failure to file a SAR may subject the bank and its officers "to supervisory action." 12 C.F.R. § 21.11(i).

Banks are broadly immune from liability for the consequences of filing a SAR. 12 C.F.R. § 21.11(*l*). A similar regulation covers state banking institutions in the federal reserve system. 12 C.F.R. § 208.62.

**6.** We note that we are not adopting the *Frost Nat'l Bank* analysis as controlling law. We simply find the analysis helpful, persuasive, and consistent with our *Althaus* analysis.

First Union owes a duty to Appellant under the circumstances.

¶ 20 Even assuming *arguendo* that a duty existed and that First Union breached it, we would still affirm the trial court's grant of summary judgment based on a lack of proximate cause. This Court recently explained the concept of proximate cause at length, as follows:

It is beyond question that the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation. Furthermore, our Supreme Court has stated that even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct, and it must be shown to have been the proximate cause of plaintiff's injury.

Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm. Proximate cause does not exist where the causal chain of events resulting in plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm.

Proximate cause is a question of law to be determined by the court before the issue of actual cause may be put to the jury. A determination of legal causation, essentially regards whether the negligence, if any, was so remote that as a matter of law, the actor cannot be held legally responsible for the harm which subsequently occurred. Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of.

. . .

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(a) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]

(c) lapse of time.

*Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286–1288 (Pa.Super.2005) (citations, brackets, and ellipses omitted), *appeal denied*, 587 Pa. 731, 901 A.2d 499 (Pa.2006).

¶ 21 Appellant explains its theory of causation as follows:

If C.F. Foods collapsed, First Union/Corestates was in danger of losing more than fourteen million dollars. Moreover, First Union/Corestates had to keep the C.F. Foods account open so as to not alert the outside world to the activities occurring within C.F. Foods. If C.F. Foods collapsed at any point, *even months after repayment of the Loan,*[7] First Union/Corestates was in danger of losing the six million dollars either through the likely C.F. Foods bankruptcy proceedings and its ninety-day preference period, the likely federal investigation, or through the action of G.P. Stillman [8] in seeking to recoup

7. First Union extended a six million dollar loan to C.F. Foods.

8. G.P. Stillman is Edward Stillman's cousin. According to Appellant, First Union loaned

his losses or Ed Stillman in seeking to exculpate himself from liability for the actions of C.F. Foods. **Under any of these scenarios, C.F. Foods would not have existed in March 1999, certainly no statement of accounts would have existed, [Appellant] would not have opened an account for C.F. Foods in March 1999, and thus, [Appellant] would not have been damaged.**

Appellant's Brief at 43 (emphasis added).

¶ 22 The trial court rejected this theory as being unduly speculative. We see no error of law in this assessment. In our view, Appellant has set forth, at best, a "but-for" theory of causation. Even according to Appellant's statement of the facts, First Union simply kept the CF Foods account active when it should have taken actions to close the account. In essence, First Union allowed CF Foods to continue its existence, which ultimately resulted in additional check-kiting on Appellant's account.

■ ¶ 23 Establishing "but-for" causation, however, is not sufficient. As noted above, a plaintiff must show that the causation was of a type that reasonable people would consider fair, natural, and probable. *Lux.* Appellant has failed as a matter of law to make that showing. First Union's actions were *only one minor factor* in the entire chain of events leading to the second check-kiting scheme involving Appellant's account. Other, far more significant, factors included: (1) CF Foods' independent decision to approach Appellant for a business account; (2) Appellant's own decision to open an account for CF Foods based on the First Union account, apparently without further background checks; (3) CF Foods' check-kiting action on Appellant's account; and (4) Appellant's fail-

ure to detect CF Foods' check-kiting any earlier than it did.

¶ 24 In essence, Appellant seeks to hold First Union liable for all fraudulent acts of CF Foods that took place after First Union knew that CF Foods was a "bad actor" and yet took no action to make CF Foods collapse. This stretches the concepts of proximate cause and individual responsibility beyond the breaking point. We see no error in the court's decision to grant summary judgment to First Union based on a lack of proximate cause.

*Negligence per se*

■ ¶ 25 Finally, with regard to the negligence claims, Appellant argues in the alternative that the trial court ignored its claim of negligence *per se.* The *Lux* Court explained the concept of negligence *per se,* and the continuing requirement to prove causation, as follows:

> The concept of negligence *per se* establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. A plaintiff, however, having proven negligence *per se,* cannot recover unless it can be proven that such negligence was the proximate cause of the injury.

*Lux,* 887 A.2d at 1287 (citations omitted). Here, we decline to hold that First Union's failure to take action under federal law constitutes negligence per se. See *B.E.L.T., Inc.,* 403 F.3d at 476–477. Even if we did so hold, Appellant would be unable to establish proximate cause. Thus, we affirm the grant of summary judgment on this claim, to the extent that Appellant asserted such a claim.

over six million dollars to G.P. Stillman, "who had invested that money in C.F. Foods promissory notes. If C.F. Foods collapsed,

G.P. Stillman's collateral would be worthless." Appellant's Brief at 7.

### 2. *Civil Conspiracy*

 ¶ 26 Next, Appellant argues that the trial court erred by granting summary judgment to First Union on Appellant's civil conspiracy claim. Our Supreme Court explained this cause of action as follows:

> In order to state a cause of action for civil conspiracy, a plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (citations omitted). Thus, in order to withstand summary judgment on this claim, Appellants must have produced evidence which would establish that Appellees acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.

*Skipworth by Williams v. Lead Indus. Ass'n.*, 547 Pa. 224, 690 A.2d 169, 174 (1997).

¶ 27 The trial court granted summary judgment on this claim because Appellant failed to show "that First Union Conspired with CF Foods to retain funds belonging to Commerce Bank." Trial Court Order, 1/20/2004, at n. 1. In response, Appellant argues that CF Foods and First Union conspired to commit fraud. In essence, Appellant argues that First Union knew of CF Foods' check-kiting scheme, took no action to stop it, and even took certain actions to keep CF Foods afloat in the hope that doing so would prevent collapse of the account and $14 million in exposure.

¶ 28 Even accepting Appellant's allegations as true, summary judgment was appropriate. Appellant fails to identify any collusion **directed at Appellant itself.** Rather, Appellant focuses on alleged fraud that took place within the CF Foods account at First Union long **before** CF Foods ever approached Appellant for a business account. Again, at most, the record reflects that First Union allowed CF Foods' account to remain open, thus allowing CF Foods to use it as a reference for getting an account with Appellant.

¶ 29 We recognize Appellant's theory that no damage would have taken place without certain acts by both CF Foods and First Union. Appellant's version of the facts, however, simply does not establish that CF Foods and First Union worked **together** in a common scheme and with shared intent to harm Appellant. Rather, the decision to approach Appellant for a bank account and to operate a check-kiting scheme from that account appears to have been CF Foods' decision alone. The essence of a conspiracy is missing. Because the record does not support a viable conspiracy claim, the trial court did not err in dismissing it as a matter of law. Appellant is not entitled to relief.

### 3. *Unjust Enrichment*

 ¶ 30 Next, Appellant argues that the trial court erred by dismissing Appellant's claim for unjust enrichment. This Court recently summarized the principles of unjust enrichment (quasi-contract) as follows:

> A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. The elements of unjust enrichment are 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance

and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.' The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit.*

*Lackner v. Glosser,* 892 A.2d 21, 31–32 (Pa.Super.2006) (citations omitted).

¶ 31 The trial court found that Appellant's unjust enrichment claim failed as a matter of law because Appellant "cannot establish element # 1, that its actions conferred any benefit to First Union." Trial Court Order, 1/20/2004, at n. 1. In response, Appellant argues that First Union successfully "shifted the loss" from First Union to Appellant. Specifically, Appellant reasons that if First Union had taken early appropriate action to shut down CF Foods, the loss would have fallen on First Union. By allowing the CF Foods account to stay active, First Union allowed CF Foods to continue its check-kiting on Appellant's account, thus "shifting the loss" from First Union to Appellant.

¶ 32 Appellant's argument is both perplexing and unpersuasive. The essence of an unjust enrichment claim is that First Union currently possesses funds that belong to the Appellant, under unjust circumstances that require First Union to return the funds to the Appellant. Here, Appellant cannot establish that First Union possesses any funds that rightly belong to Appellant. At best, Appellant established that CF Foods operated a check-

kiting scheme that resulted in losses to Appellant. If anyone possessed funds unjustly, it is presumably CF Foods. Appellant's discussion of "shifting the loss" is an interesting theoretical exercise, but it does not give rise to a viable cause of action for unjust enrichment. We agree with the trial court that Appellant failed to establish a fundamental element of an unjust enrichment claim. Thus, the court did not err by granting summary judgment.

4. *Constructive Trust*

■ ¶ 33 Finally, Appellant argues that the court erred by dismissing its claim for imposition of a constructive trust.

"A 'constructive trust' is defined as a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property."

*Kern v. Kern,* 892 A.2d 1, 8–9 (Pa.Super.2005) (citation omitted), appeal denied, 588 Pa. 765, 903 A.2d 1234, 2006 Pa. LEXIS 1384 (Pa. Aug. 1, 2006).

■ ¶ 34 The trial court found that the remedy of a constructive trust was inappropriate because (as noted above) First Union does not wrongfully possess any of Appellant's property. For the reasons set forth above in our discussion of unjust enrichment, we agree. Appellant's claim lacks merit.

B. *The Appeal Involving Edward Stillman*

¶ 35 We now turn to the appeal involving Edward Stillman. Appellant argues that the trial court erred by granting Stillman's Petition to Enforce Settlement Agreement. Our Supreme Court set forth the principles of law governing this claim as follows:

The enforceability of settlement agreements is governed by principles of contract law. To be enforceable, a settlement agreement must possess all of the elements of a valid contract. As with any contract, it is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement.

Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement. Even the inability of the parties to an oral agreement to reduce such agreement to writing after several attempts does not necessarily preclude a finding that the oral agreement was enforceable.

When there exists conflicting evidence as to whether the parties intended that a particular writing would constitute a complete expression of their agreement, the parties' intent is a question to be resolved by the finder of fact[.] We will not reverse such finding unless it is unsupported by the evidence, or unless the fact finder has clearly abused its discretion or committed an error of law. In reviewing such finding, we are mindful that it is understandable that when, after a prolonged period of negotiations, parties appear to reach agreement on the essential terms of an important transaction, one of them might believe that a contract had been made. However, before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain.

If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced. If, however, there exist ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce, such an agreement must be set aside.

*Mazzella v. Koken,* 559 Pa. 216, 739 A.2d 531, 536–537 (1999) (citations, brackets, and quotation marks omitted); [9] *see also Pulcinello v. CONRAIL,* 784 A.2d 122, 124 (Pa.Super.2001) ("An oral settlement agreement may be enforceable and legally binding without a writing.... Where parties have reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement."), *appeal denied,* 568 Pa. 703, 796 A.2d 984 (2002).

■■ ¶ 36 "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.,* 559 Pa. 56, 739 A.2d 133, 136 (1999). For instance, in *Franklin Interiors v. Wall of Fame Management Co.,* 510 Pa. 597, 511 A.2d 761 (1986), the contract at issue expressly stated that "this document does not become a contract until approved by an officer of Franklin Interiors." *Id.* at 762. Our Supreme Court held that the contract was not enforceable because there was no evidence that an officer of Franklin Interiors ever approved or signed the contract. *Id.; see also InfoComp, Inc. v. Electra Prods.,* 109 F.3d 902 (3rd Cir.Pa. 1997) (alleged agreement was unenforceable when it stated that it would not be deemed "accepted" until it was signed by

**9.** In *Mazzella,* our Supreme Court concluded that a series of proposals and counter-proposals did not give rise to an enforceable contract, because the parties had not come to a meeting of the minds on all essential terms. This was true because each proposal contained material changes from the previous proposal.

an authorized officer or manager, and no signature was ever forthcoming).

¶ 37 In contrast, in *Shovel Transfer*, the parties agreed to all material terms of a contract and apparently intended to sign the contract, but one of the parties ultimately refused to sign it. Our Supreme Court held that the agreement was enforceable, even in the absence of all signatures, because the parties did not expressly intend the agreement to be conditioned on signatures. *Shovel Transfer*, 739 A.2d at 138–139.

■ ¶ 38 With this legal background in mind, we will now examine the evidence, the trial court's findings of fact, and the terms of the settlement agreement itself. The trial court held an evidentiary hearing on this issue. The evidence established that on May 8, 2003, Stillman's counsel faxed a Settlement Agreement to Appellant's counsel. The cover letter stated: "Per our conversation this date, enclosed is the revised Agreement regarding the resolution of the claims made by Commerce Bank against Edward Stillman.... Please fax me a letter before tomorrow's oral argument acknowledging that your client agrees to the terms of the enclosed Agreement and that an authorized representative of your client will sign it and it will be returned to me within a reasonable time. Upon receipt of same from you, we will see to it that the Agreement is signed by Ed Stillman." Petition to Enforce Settlement Agreement, Exhibit A. Later that day, Appellant's counsel sent an email to Stillman's counsel, stating: "This will confirm that we have agreed to enter into the settlement agreement as revised by you this afternoon." *Id.*, Exhibit B.

¶ 39 The settlement agreement itself provides that: (1) Appellant will take appropriate action to terminate its claims against Stillman at case No. 99–03068; (2) Appellant will dismiss and/or not pursue

any claims against Stillman at Case No. 00–9520; and (3) upon certain triggering events, Appellant and Stillman will agree to binding arbitration of certain outstanding issues between the parties. Petition to Enforce Settlement Agreement, Exhibit A. The agreement further states that "For purposes of this Agreement and for resolving any ambiguity herein, the parties agree that this Agreement was jointly prepared by their respective attorneys." Finally, and most importantly, the agreement does **not** state that it is effective only if each party signs it. *Id.*

¶ 40 At the evidentiary hearing, Stillman's counsel argued that the parties had come to a meeting of the minds, and that a signature was expected from Appellant in due course "as a mere formality." N.T., Enforcement Hearing, at 12. Stillman's counsel obtained Stillman's signature on the agreement, and was waiting for Appellant's counsel to procure Appellant's signature. Stillman's counsel also testified that he periodically checked with Appellant's counsel for a signature, and Appellant's counsel repeatedly assured Stillman's counsel that one would be forthcoming. *Id.* at 12–15, 20–22; *see also* Petition to Enforce, Exhibit C (letter from Stillman's counsel to Appellant's counsel dated February 3, 2004, stating: "Although we have received repeated assurances from you that the Agreement would be signed on behalf of Commerce Bank, we have not yet received a copy of the Agreement bearing a signature of an authorized officer of Commerce Bank.")

¶ 41 Moreover, at the hearing, Appellant's counsel conceded that his e-mail expressed an agreement on the language of the settlement agreement:

> Appellant's Counsel: Exhibit B was an e-mail from myself to [Stillman's counsel] confirming that the terms of the proposed settlement agreement had

been agreed to. That we had agreed on language by what the parties could settle in the case.

*Id.* at 35.

¶ 42 After the hearing, the trial court found that Appellant and Stillman reached a meeting of the minds on all material terms, and reduced the agreement to writing, even though that agreement was never signed. The record supports the trial court's findings of fact and conclusions of law. As noted above, an agreement is binding if the parties come to a meeting of the minds on all essential terms, even if they expect the agreement to be reduced to writing but that formality does not take place. *Mazzella; Shovel Transfer.* Such was the case here. This is not a case such as *Franklin Interiors* or *InfoComp,* where the agreement itself explicitly states that it will not be effective unless it is signed. Thus, we conclude that the trial court did not err or abuse its discretion when it granted Stillman's petition to enforce the settlement agreement. Appellant's final claim fails.

¶ 43 Orders affirmed.