**Lebanon County Earned Income Tax Bureau v. Bank of Lebanon County**

74

*Louis A. Modugno* and *Matthew A. Lippman,* for plaintiff.

*Charles T. Young,* for defendant PNC Bank National.

*David L. Pennington,* for defendant Faren Garcia & Garman.

CHARLES, *J.,* January 10, 2011—

TABLE OF CONTENTS

I.   TABLE OF DESIGNATIONS

II.  FACTUAL BACKGROUND             (4)

III. ISSUES                        (15)

IV.  SUMMARY JUDGMENT STANDARD     (16)

V.   DISCUSSION                    (18)

A. DUTY (18)

(1) EIT Was A Customer Of BANK
To Whom A Duty Could Be Owed (20)

(2) Duty Under UCC (20)

(3) Common Law Principles (22)

(4) Material Issue Of Fact (23)

(5) Summary As To Duty (29)

B. UNIFORM FIDUCIARIES ACT
IMMUNITY (30)

C. RESCISSION (34)

D. UNJUST ENRICHMENT (39)

E. CONVERSION (41)

F. STATUTE OF LIMITATIONS (43)

G. BANK STATEMENT RULE (43)

H. GIST OF THE ACTION DOCTRINE (45)

I. ECONOMIC LOSS DOCTRINE (47)

J. CONTRIBUTORY NEGLIGENCE (51)

VI. CONCLUSION (53)

Before us is what we will euphemistically describe as a "banking malpractice" case. Plaintiff Lebanon County Earned Income Tax Bureau (hereafter "EIT") has submitted a multitude of claims against the defendant bank of Lebanon County, a division of BLC bank, N.A. (hereafter "bank"). Stripped to its essence, and eschewing "legalese," EIT's claim is that bank was erred in two

respects:

(1) In its decision to open a bank account for EIT without proper documentation; and

(2) In its ongoing management of EIT's account.

For reasons that we will articulate in more detail below, we will be dismissing all of EIT's claims that involve bank's ongoing management of EIT's bank account. However, we will send to trial EIT's claim that bank was negligent with respect to the opening of an account in EIT's name.

## I. TABLE OF DESIGNATIONS

To promote efficiency of space, throughout this opinion we will be referring to various entities and individuals with acronyms or one word designations. For convenience, we will be listing all of our designations within this section as follows:

(1) Bank - Bank of Lebanon County, a division of BLC Bank, N.A., the defendant in action 2007-01270.

(2) Bank account - The account opened by Foltz with bank in June of 2002 into which Foltz deposited $895,676.15 of public funds that had been entrusted to EIT.

(3) Bucher -- Audrey Bucher, an employee of bank.

(4) COMMITTEE -- EIT's Executive Committee

(5) EIT - Lebanon County Earning Income Tax Bureau, plaintiff in the above-referenced litigation.

(6) ELD - Economic Loss Doctrine.

(7) Faren - Faren Garcia & Garman, P.C., Faren &

Associates, P.C., Steiner & Faren, P.C. and James F. Faren, the defendant in action no. 2008-00990.

(8) Fink - Anna Fink, an employee of bank.

(9) Foltz - Donald Foltz, the former executive director of EIT.

(10) UCC - Pennsylvania's version of the Uniform Commercial Code, found at 13 Pa.C.S.A. § 1101 et seq.

(11) UFA - Uniform Fiduciary Act.

(12) Watts - Gary Watts, a member of the executive committee of EIT.

## II. FACTUAL BACKGROUND

The pleadings and exhibits attached to the motion for summary judgment and the responses thereto reveal the following undisputed facts in this matter:

(1) EIT collects earned income tax and various other tax payments from taxpayers for various school districts and municipalities.

(2) Foltz was hired as the executive director of EIT in 1987.

(3) In accordance with his position, Foltz had exclusive check-writing authority for EIT and regularly signed checks written on EIT's bank accounts (Watts Dep. at 72-74).

(4) Watts was a member of the executive committee of EIT (Watts Dep. at 15-17).

(5) The stamped signatures of Foltz and Watts appeared on checks signed through the use of EIT's check-writing

machine (Watts Dep. at 73-74).

(6) Foltz managed all of EIT's banking activities, including writing checks, making deposits, approving invoices and performing bank statement reconciliations (Oyster Dep. at 44-45).

On June 19, 2002, Foltz called bank, spoke with Fink and informed her that he was interested in opening an account on behalf of EIT with bank (Fink Dep. at 73). Fink knew of Foltz from the newspaper and the community and assumed that as the executive director, he was the person in charge of EIT (Fink Dep. at 51, 84). Fink had never met Foltz personally (Fink Dep. at 52). Fink was aware that Bucher, another bank employee, did know Foltz personally (Fink Dep. at 53).

In 2002, bank had a process for the opening of new accounts: the bank representative would discuss the needs with the customer, go over options as to various types of accounts in accordance with the customer's needs, reach an agreement as to the type of account, obtain customer identification, enter the customer information into a database, print necessary documents and obtain necessary signatures (Fink Dep. at 32-33). Bank would also run a Chex Systems background check to discover any information which might disqualify a customer from opening an account (Fink Dep. at 68). In some instances, it would also be necessary to obtain further documentation (Fink Dep. at 32-33). For instance, for business accounts, different types of resolutions would be needed (Fink Dep. at 32-33). A resolution is a formal document stating who within the organization has the right to conduct certain transactions with the account (Fink Dep. at 34). If a customer needed to take a resolution form in order to obtain

authorized signatures, bank would permit the customer to open the account and deposit funds prior to the return of the resolution (Fink Dep. at 94). Bank's standard practice was to require that the secretary and another officer of an organization sign a resolution (Fink dep. at 103). Usually, bank would ask for articles of incorporation or a similar document to ascertain the structure of a customer's organization (Bucher Dep. at 29). Normally, "if there was any issue as far as its completeness or any reason why on the document we would question the person doing the completion, we would talk to the customer" (Fink Dep. at 82). Documents would also be reviewed at bank's back office in East Petersburg for completeness (Bucher Dep. at 64-65; Fink Dep. at 110).

After receiving Foltz's phone call, Fink informed Bucher that Foltz was interested in opening the account for EIT and that Fink was going to have Bucher take care of the resolution which was necessary for opening the account. Fink also stated that she had already inputted information about EIT into bank's computer system, and that Foltz would be coming in to sign the necessary documents and provide further information (Bucher Dep. at 34-35). Fink instructed Bucher to use an "unincorporated resolution" to open the account (Fink Dep. at 35-36).

Fink had worked at other banks in the past but had just been hired by bank in 2001 (Fink Dep. at 19). In her new position with bank she was involved with the opening of accounts but had never had such duties in her prior positions (Fink Dep. at 20). Bucher was a part-time customer service employee at bank who had been hired by bank in 2002 (Bucher Dep. at 16-20). This position also involved performing the duties of a teller and the

opening and maintenance of accounts (Bucher Dep. at 21). Bucher also had prior experience, having worked in the banking industry on a part-time basis since 1977 at other banks, but, like Fink, had never been involved in the opening of accounts before (Bucher Dep. at 16-17). Both employees had received training in opening accounts and fraud (Bucher Dep. at 21-25; Fink Dep. at 29-31). Bucher and Fink were the only two (of the three employees on the premises) who handled the opening of new accounts (Fink Dep. at 73). Bucher reported to Fink at that time (Fink Dep. at 26-27).

Foltz came to bank premises on June 20, 2002 in order to open bank account (Bucher Dep. at 41). Bucher knew Foltz for a number of years from his dealings on behalf of EIT at the two area banks where she had previously been employed (Bucher Dep. at 31-33). Bucher assumed that Fink had already discussed with Foltz the type of account which would be appropriate for EIT (Bucher Dep. at 40). Bucher did not require identification from Foltz or ask for any further documentation (Bucher Dep. at 27, 29).

In order to open a bank account, a document titled "new deposit account checklist" was used (Exh. 1 to Fink Dep.). Bucher stated that both she and Fink filled out some of this information (Bucher Dep. at 42). This document contained a question as to whether the new account would deal with public funds (Bucher Dep. at 47). The answer was marked "no" even though Bucher stated that "...in this case, I would have thought this was using public funds" (Bucher Dep. at 47; Exh. 1 to Fink Dep.). Bucher did not ask Foltz for identification or a copy of any articles of incorporation or other organization documentation (Bucher Dep. at 27-

29). Based on her trust in Foltz's representations and her knowledge of his position with EIT, Bucher felt that he had authorization to open bank account (Bucher Dep. at 59).

On June 21, 2002, Bucher accepted a deposit into the bank account from Foltz which consisted of four checks totaling $51,066.42, all of which were payable to EIT and were more than sixty days old (Bucher Dep. at 71). Bucher testified that often, when a business was opening an account, it would use a cashier's check from another institution rather than bringing in checks made out to itself (Bucher Dep. at 73). Bucher would have usually run some of these items by Fink, but did not do so in this instance (Bucher Dep. at 73-73).

Foltz was given a resolution authorizing bank account form which was to be executed for bank account (Bucher Dep. at 54). This document, which was returned by Foltz on June 28, 2002, indicated that the opening of the bank account was authorized by a resolution of the board of directors at a meeting on March 1966 (Fink Exh. 2). Bucher does not recall that Foltz ever presented the March 1966 document to bank (Bucher Dep. at 58, 60). Using typewritten information for ease of understanding, the resolution form returned by Foltz was as follows:

"CERTIFIED COPY OF RESOLUTIONS
AUTHORIZING BANK ACCOUNT

"(For use by Unincorporated Association or
organization)

"Account Name: Lebanon Co. Earned Income -
Account:# 61002046-01 Date: 6-20-10 Tax Bureau

"Exec. Director

"We, Lebanon Co. Earned Income Tax Bureau, President, and Secretary of _____(hereafter sometimes called "organization"), do hereby jointly and severally certify as follows:

"1. That said organization is not incorporated.

"2. That the following is a true copy of certain resolutions duly adopted on (date) March 1966, at a meeting of board of directors (council, board, etc.), the governing body of said organization, duly called and held; and that said resolutions have been modified or rescinded and are now in full force and effect; and that the same are not in contravention of or in conflict with its by-laws or constitution of said organization and are in accord therewith and pursuant thereto.

"3. Any _____(specify number) of the following_____(officers, elders, council members, etc.) of this organization is/are authorized, on behalf of this organization and in its name, to open and to have access to a safe deposit box under the terms and conditions of the said bank safe deposit box contract.

"Resolved that an account of deposit opened as continued and maintained with bank of Lancaster County, N.A., titled Lebanon Co. Earned Income Tax Bureau and that funds of this organization on deposit in the said bank shall be subject to withdrawal by checks, notes, drafts, bills of exchange, acceptances, orders or other instruments made in the name of said organization are signed by any 1 person (specify number) of the following of this organization:

"TITLES OF AUTHORIZED SIGNERS

"Title: Executive Director     Title:_____

"Title: _____     Title: _____

"and all such checks, notes, drafts, bills of exchange, acceptances, orders or other instruments signed as aforesaid on behalf of this organization, drawn upon said bank as drawee or made payable at or to said bank, including instruments drawn to cash or bearer or to the individual order of any officers, employee or member of this organization (whether signed by such person or otherwise), shall be honored and paid by said bank and charged to the account of this organization, and said bank may receive the same in payment of or as security for the personal indebtedness of any signer or other officer, employee or member to the bank, or in any transaction whether or not known to be for the personal benefit of any such person, without inquiry as to the circumstances of their issue or the disposition of their proceeds and without liability to this organization, and without any obligation upon said bank to inquire whether the same be drawn as required for this organization's business or benefit.

"Further resolved, that the President and Secretary of this organization are each hereby directed to certify to said bank a copy of these resolutions and the name of the present incumbents of the offices hereinbefore referred to, and to further certify from time to time hereafter the names of any successors to the present incumbents of said offices, together with specimens of their respective signatures; and said bank is hereby authorized, empowered and directed to rally upon any such certificate unless and until the same shall have been revoked or altered by a subsequent certificate for this organization actually received by said bank.

"Further resolved, that the foregoing resolutions shall continue in full force and effect until written notice of revocation, duly signed by the President and Secretary, in the name of this organization, or a certified copy of a subsequent resolution of this organization pertaining to matters herein contained shall have been actually received by said bank.

"4. That the following named persons are officers of said organization, in the capacities set opposite their respective specimen signatures:

| "NAME | TITLE | SIGNATURE |
|---|---|---|
| "Donald F. Foltz | Exec Director | |
| " | | |
| " | | |

"In witness whereof, we have hereunto subscribed our names this 28th day of June, 2002.

"Donald F. Foltz
"

"President Exec. Director          Secretary"

On the resolution form, there was also a space for both a "president" and a "secretary" to sign (Fink Exh. 2). When Foltz returned this form, the word "president" was crossed out and replaced with the words "executive director" and the line for the name of the secretary was left blank (Fink Exh. 2; Bucher Dep. at 57). Bucher testified at her deposition that "[w]e would have normally had it signed by a secretary; but he - for all we knew, he was the executive director. He was pretty much, you know, the only one" (Bucher Dep. at 57-58). Fink also indicated that it would have been normal procedure to have this document signed by the organization secretary (Fink Dep. at 103). Bucher further testified that it would have been normal

procedure to make inquiry as to the existence of a secretary (Bucher Dep. at 58). Bucher did not have knowledge as to whether Foltz reported to anyone at EIT (Bucher Dep. at 30). She simply did not feel that the authorization of a secretary was needed based on her knowledge of his position (Bucher Dep. at 61-62). Foltz was made the sole signatory for checks drawn on bank account (Fink Exh. 2). He advised bank that other signatures were not necessary (Bucher Dep. at 56). Bucher believed his representations as a "matter of trust" (Bucher Dep. at 56).

At first, Foltz provided an address to which the bank statements would be sent (Bucher Dep. at 74). In or about April 2003, he made a request that the statements be held at bank for him to pick up and a maintenance request to that effect was issued by bank (Bucher Dep. at 74-76). After bank account was opened, Foltz made a deposit approximately once a month (Bucher Dep. at 80-81). When these checks were deposited, bank checked to see that the amount indicated for deposit was correct and that the checks were endorsed; however, bank did not check to see what types of checks were being deposited or to whom checks drawn on bank account were made out (Bucher Dep. at 81-82).

Foltz's activities with regard to bank account continued for some time. In or about summer to fall of 2006, EIT's committee commenced an investigation into the affairs of EIT based on the fact that audit reports for EIT were not being completed and complaints about EIT were being lodged by "[e]veryone that had contact with the bureau; individual taxpayers, neighboring counties that weren't getting paid on time, municipalities that were questioning procedures, and the business managers from the school districts not getting the audit reports" (Watts Dep. at 85-

86). Faren was to have been conducting audits and issuing reports for EIT. However, Foltz had been cancelling meetings with Faren with regard to getting the audits and reports done and was not providing Faren with the information which was needed to complete these reports (Watts Dep. at 87-88). No audit reports had been completed for approximately two years at this point (Watts Dep. at 89-91). Despite committee's requests, Foltz failed to remedy the situation (Watts Dep. at 95). Eventually, committee began to suspect that Foltz was stealing money (Watts Dep. at 97). The accounting firm of Boyer & Ritter was hired shortly thereafter to conduct an in-depth review of accounting procedures and internal control of EIT (Watts Dep. at 94-95, 145-147).

As a result of their investigation, Boyer & Ritter reported numerous deficiencies in the operation of EIT. Foltz was placed on administrative leave on March 7, 2007 and was terminated on March 14, 2007. The new interim executive director, Nancy Moran, then received a phone call from bank due to bank's having learned of Foltz's termination. Bank made an inquiry as to what should be done with the monthly statements of the bank account with bank. It was at this time that EIT learned of the existence of the bank account (Watts Dep. at 148). After receiving copies of monthly statements and cancelled checks, EIT learned that most of the checks drawn on bank account had been made payable to Foltz.

The bank account was closed on March 26, 2007 by Foltz and EIT's attorney at the direction of EIT. The funds remaining in the account, $80,409.30 were returned to EIT (Exh. L to EIT's Brief in Opposition to Motion for Summary Judgment). Foltz committed suicide on March 31, 2007. It was determined that during the time bank

account was active, Foltz had deposited $895,676.15 of taxpayer funds into the bank account and had written checks totaling $811,000.00 payable to himself.

EIT commenced this action against bank on June 22, 2007 and a complaint was filed on May 9, 2008. After preliminary objections were filed and ruled upon, an amended complaint and a second amended complaint were filed. Bank filed its answer and new matter to the second amended complaint and subsequently amended its new matter.

On May 9, 2008, EIT also filed a complaint against Faren for matters related to its duties as EIT's auditors during the time relevant to this matter. Faren filed its answer and new matter on June 13, 2008 and on December 15, 2008, Faren's motion to join bank as a third party defendant and a third party complaint was filed on December 18, 2008. Bank filed an answer with new matter and counterclaim on March 18, 2009. Faren filed an answer to bank's counterclaim on April 9, 2009.

After the parties conducted discovery, bank filed a motion for summary judgment against EIT. The parties have filed briefs, and we have had the benefit of oral argument. This dispute is now ripe for disposition.

## III. ISSUES

In its summary judgment submissions, bank has thrown the proverbial "legal kitchen sink" at EIT. Specifically, the ten issues raised by bank in its brief are as follows:

(1) PNC Bank owed no duty of care to the EIT upon which the EIT may base its claims.

(2) The UFA bars the EIT's claims because the EIT cannot demonstrate that PNC Bank failed to act in good faith.

(3) The court should grant summary judgment in favor of PNC Bank with respect to the EIT's claim for rescission.

(4) The court should grant summary judgment in favor of PNC Bank with respect to the EIT's claim for unjust enrichment because the EIT cannot establish that a benefit was conferred on PNC Bank.

(5) The court should grant summary judgment in favor of PNC Bank on the EIT's conversion claim because an "issuer," such as EIT, may not maintain a claim for conversion under the UCC.

(6) Any claim for conversion regarding checks deposited prior to June 22, 2004, is barred by the three-year statute of limitations.

(7) The bank statements rule bars the EIT from recovering for any checks paid out prior to April 30, 2003.

(8) The "gist of the action" doctrine bars the EIT's tort claims against PNC Bank because those claims are based primarily on a contractual relationship.

(9) The "economic loss" rule bars EIT's tort claims against PNC Bank because those claims would both conflict with, and undermine the purposes underlying the UFA and UCC.

(10) EIT's common law tort claims are barred by its admitted contributory negligence.

It is clear to us that bank's primary argument is that

it owed no duty to EIT. Because of the primacy of this argument, and because our decision regarding duty will impact upon several of the other arguments raised by the parties, we will address bank's duty argument first. Thereafter, we will discuss the remaining issues raised by bank in support of its motion for summary judgment.

## IV. SUMMARY JUDGMENT STANDARD

Bank has filed a motion for summary judgment against EIT pursuant to Pa.R.C.P. No. 1035.2. This rule provides as follows:

Rule 1035.2. Motion.

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

A court may grant summary judgment only where the right to such a judgment is clear and free from doubt. *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186 (Pa. 2007). In considering the merits of a motion for summary

judgment, a court must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* A "material fact" on a motion for summary judgment, is one that directly affects the outcome of the case. *Fortney v. Callenberger*, 801 A.2d 594 (Pa.Super. 2002). A court may grant summary judgment whenever there is no genuine issue of any material fact as to a necessary elements of the cause of action or defense that could be established by additional discovery. *Swords v. Harleysville Inc. Companies*, 584 Pa. 382, 883 A.2d 562 (Pa. 2005).

Under Rule 1035.3 the adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response "...identifying (1) one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion, or (2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced." Pa.R.C.P. § 1035.3. The "record" on a motion for summary judgment includes any (1) pleadings, (2) depositions, answers to interrogatories, admissions and affidavits, and (3) reports signed by an expert witness that would, if filed, comply with Rule 4003.5(a)(1), whether or not the reports have been produced in response to interrogatories. Pa.R.C.P. § 1035.1.

## V. DISCUSSION

### A. *DUTY*

The following are the elements of a negligence action:

(1) A duty recognized by law requiring the actor to conform to a certain standard with respect to the injured party;

(2) A failure of the actor to conform to that standard;

(3) A causal connection between the conduct and the resulting injury; and

(4) Actual loss or damage to the interest of another.

*Felli v. Commonwealth Dept. of Transportation,* 666 A.2d 775 (Pa. Cmwlth. 1995). At issue in this case is the element of duty.

A duty triggers one party's obligation to conform to a particular standard of conduct for the protection of another. *Wisniski v. Brown and Brown Insurance Company,* 906 A.2d 571 (Pa. Super. 2006). The concept of duty is "rooted in public policy." *R.W. v. Manzak,* 585 Pa. 335, 346, 888 A.2d 740, 746 (Pa. 2005). Since the earliest days of Pennsylvania jurisprudence, our courts have recognized that "no fixed rule of duty, applicable to all cases, can be established. A course of conduct justly regarded as resulting from the exercise of ordinary care in some circumstances would exhibit the grossest negligence under other circumstances." *Pa.R.R. v. Coon,* 3 A.234 (Pa. 1886). Our Superior Court has stated:

> In determining the existence of a duty of care, the time honored test formulated by Judge Cardozo is that "the risk reasonably to be perceived defines the duty to be obeyed..." *Robert Wooler Company v. Fidelity,* 479 A.2d 1027, 1032 (Pa. Super. 1984), quoting in part *Pfalsgraf v. Long Island Railroad,* 248 N.Y. 339, 162 N.E. 99 (1928).

In negligence cases, the issue of duty and breach of duty are almost always inextricably linked. See, e.g. *Althaus v. Cohen*, 562 Pa. 597, 756 A.2d 1166 (Pa. 2000). In most cases, the question of whether a duty exists is a question of law and not fact. *Huddelston v. Infertility Center of America*, 700 A.2d 453 (Pa. Super. 1997). However, as the court noted in *Robert Wooler*, supra, "only when the question of foreseeability [of risk] is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff." *Robert Wooler*, supra, at 1032.

Under Pennsylvania law, the element of duty for purposes of a negligence claim can be created either by statute or by common law principles. *Shamnoski v. P.G. Energy, Division of Southern Union*, 579 Pa. 652, 858 A.2d 589 (Pa. 2004). In this case, EIT claims that bank owed it a duty based upon both statute and common law principles. We will discuss each. However, before we do so, we wish to comment upon one of bank's threshold issues, namely, that EIT was a "stranger" to whom bank wed no duty.

(1) *EIT was a customer of bank to whom a duty could be owed*

In support of its request for summary judgment, bank proffers the interesting but flawed argument that it did not owe EIT any duty of care because EIT was a "non-customer" and "effectively a stranger." Bank argues that because Foltz is alleged to have opened bank account without proper authorization, Foltz and not EIT was the "customer."

We categorically reject this argument. The bank account

was opened in the name of EIT, not Foltz. The checks that were deposited into bank account were made payable to EIT, not Foltz. The funds contained in the bank account were considered by everyone - except perhaps Foltz - as belonging to EIT. In fact, bank has repeatedly emphasized that once the embezzlement by Foltz was discovered, funds remaining inside the bank account were returned by bank to EIT. Under any definition of the term, EIT must be considered bank's "customer" with respect to the bank account.[1]

### (2)  *Duty Under UCC*

Pennsylvania's version of the UCC states, in pertinent part:

> If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss. 13 Pa.C.S.A. § 3405(b).

While relatively broad in its language, the official comment to 13 Pa.C.S.A. § 3405 makes clear that its purview includes situations similar to the one at hand.

Illustration no. 4 sets forth a scenario in which a bank

---

[1]. Even the case law cited by bank does not necessarily support its position that EIT was a "non customer stranger." For example, in *Eisenberg v. Wachovia Bank, NA*, 301 F.3d 220 (4th Cir. 2002), the court ruled in favor of the bank because the plaintiff was "neither a Wachovia customer nor the person in whose name the fraudulent bank account was opened." *Eisenberg*, supra at pg. 226. In this case, EIT is the entity in whose name the fraudulent bank account was opened.

permits a business manager to open an account in the name of an employer "without requiring employee to produce any resolutions of the corporation's board of directors or other evidence of authorization of the employee to act for the corporation." Under such circumstances, the comment explains:

> The depository bank may have failed to exercise ordinary care when it allowed the employee to open an account in the name [of his employer] to deposit checks payable to [his employer] in that account, or to withdraw funds from that account that were proceeds of checks payable to [his employer]. Failure to exercise ordinary care is to be determined in the context of all the facts relating to the bank's conduct with respect to the bank's collection of the check. If the trier of fact finds that there was such a failure and that the failure substantially contributed to the loss, it could find the depository bank liable to the extent the failure contributed to the loss...The trier of fact could find that the depository bank did not exercise ordinary care and that the failure to exercise ordinary care contributed to the loss suffered by employer. The trier of fact could allow recovery by employer from depository bank for all or part of the loss suffered by employer. Official comment 4 to 13 Pa.C.S.A. § 3405.

Based upon UCC § 3405 and its official comment, we conclude that bank owed EIT a duty to "exercise ordinary care" in the opening of EIT's bank account.

(3) *Common Law Principles*

The Restatement of Torts (Second) § 299(a) states:

Unless he represents that he has greater or less skill

or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. Restatement of Torts (Second) § 299(a).

Section 299(a) of the Restatement of Torts (Second) has been followed "uniformly" by Pennsylvania courts. *Robert Wooler Company v. Fidelity*, 479 A.2d 1027 (Pa. Super. 1984). See also *Incollingo v. Ewing*, 444 Pa. 299, 282 A.2d 206 (Pa. 1971). Section 299(a) has been applied in Pennsylvania to accountants (*Robert Wooler*, supra), architects (*Bloomsburg Mills, Inc. v. Sordoni Construction*, 401 Pa. 358, 164 A.2d 201 (Pa. 1960)), attorneys (*Hoyer v. Frazee*, 470 A.2d 990 (Pa. Super. 1984)) and insurance agents (*Pressley v. Traveler's Property Casualty Company*, 817 A.2d 1131 (Pa. Super. 2003)).

We see absolutely no reason why the general rule of law articulated in § 299(a) of the Restatement of Torts (Second) should not also be applied to bankers and the banking industry. Therefore, we hold that bank owed to EIT a general common law duty to exercise the skill and knowledge normally possessed by members of the banking industry within Lebanon County.

(4) *Material Issue of Fact*

Having concluded that bank owed a duty to EIT to exercise ordinary care and that this duty of ordinary care must be measured by the skill and knowledge normally possessed by members of the banking industry within Lebanon County, we turn to the question of whether enough evidence exists to create a jury issue. As we assess

this question, we will divide our comments between the two general categories of allegations raised by EIT:

(1) Negligence in the opening of the EIT account; and

(2) Negligence in the management of the EIT account.

(a) *Negligence In The Opening Of The Account*

EIT alleges that Foltz contacted Bucher in order to open bank account. Everyone agrees that Bucher requested a corporate resolution from Foltz (Bucher N.T. 36-37). To assist Foltz, Bucher provided a form created by bank that was entitled "certified copy of resolutions authorizing bank account (for use by unincorporated association or organization)" (see Exh. C). Everyone also agrees that Foltz returned this document to bank and that bank thereafter opened the bank account.

In both its complaint and its summary judgment submissions, EIT argues that bank acted negligently in opening the bank account. Paragraph 19 of the complaint alleges bank's negligence as follows:

A. Permitting Foltz to open the account in the name of the bureau without a specific resolution authorizing same;

B. Agreeing not to forward statements for the account to the bureau, but rather permitting Foltz to pick them up at bank of Lebanon County[2]; and

C. Permitting Foltz to open the account without

---

2. We consider Paragraph 19B to fall within the general umbrella of negligence in the ongoing management of bank account.

requiring the signature of the secretary of the bureau.

These allegations in the complaint were amplified by EIT's brief and summary judgment submissions. Among the allegations raised by EIT with respect to this motion for summary judgment are the following:

- Exhibit C indicated that the EIT board of directors approved the resolution in March of 1966. This date could not possibly have been correct because the blank form was only provided to Foltz in June of 2002. In addition to the above, the date on Exhibit C could not possibly have been correct, because EIT did not exist in March of 1966.

- Exhibit C referenced EIT's "board of directors." EIT did not possess a "board of directors." Rather, it was governed by committee.

- Exhibit C contained blanks that were not filled in. Specifically, the name of the secretary and executive director were not completed.

- Exhibit C authorized "bank of Lancaster County, N.A." to open an account, not bank of Lebanon County.

- Exhibit C authorized "the President and Secretary of this organization" to approve the resolution form. Neither the president nor the secretary was identified in Exhibit C, and neither the president nor the secretary signed Exhibit C.

- Bucher and Fink approved the opening of the bank account because they "knew of" Foltz from the community and made the "assumption" that Foltz was authorized to conduct business on behalf of

EIT (Bucher N.T. 30-31; Fink N.T. 51, 84).

Attached to EIT's summary judgment submissions is a report authored by Stuart Greenberg. Mr. Greenberg's report indicates that he has been involved in commercial banking for 38 years and is aware of the standards that apply to the banking industry. Among other things, Mr. Greenberg stated that when a corporate bank account is opened with a resolution, the resolution should be accompanied by additional documentation, including a certificate of incorporation, a federal employer identification number, a copy of corporate minutes recording the authorization for opening of the account and a photo identification of the individual opening the account. Mr. Greenberg also noted that the corporate resolution submitted by Foltz was defective because it was not signed by any member of EIT's board of directors or committee. In light of all of these problems, Mr. Greenberg concluded:

> In summary, bank of Lebanon County did not adhere to its own standards much less industry standards and the larger issues of compliance with safety and soundness standards required by bank regulators. The bank's actions and lack of actions demonstrate a reckless disregard for reasonable care (Mr. Greenberg's report at pg. 6).

In addition to the expert report of Stuart Greenberg, deposition evidence clearly established that bank itself expected a corporate resolution form as a pre-condition to opening a bank account. From this, we draw the reasonable inference that a corporate resolution should be required whenever a bank opens a corporate account. Ipso facto, if a resolution is a precondition to opening an account, it must be reasonably inferred that the resolution itself should be

complete and signed by appropriate individuals. If in fact EIT did not carry through with its own undertaking, that could be construed as negligence. See e.g. *Glick v. Martin & Mohler*, 535 A.2d 626 (Pa. Super. 1987); Restatement of Torts (Second), § 323; 324 A (one who voluntarily undertakes a task or program has a general duty to perform it in a reasonable manner).

All of the above information, if established at trial, would create a jury issue with respect to the question of whether bank acted negligently in the opening of bank account. Therefore, we will deny bank's motion for summary judgment as it relates to EIT's claim of negligence in the opening of the bank account.

(b) *Management Of Account*

Paragraph 20 of EIT's complaint sets forth allegations of negligence with respect to bank's ongoing management of the bank account. Paragraph 20 reads:

A. Permitting checks to be written from the account without the requirement of a counter signature;

B. Failing to have internal controls in place to prohibit or to identify fraudulent behavior;

C. Failing to adhere to internal controls that seek to prevent fraudulent behavior; and

D. Permitting Foltz to write checks to himself for alleged consulting fees and other purposes.[3]

These allegations of the complaint were amplified in

_____

3. In addition to these allegations of paragraph 20, paragraph 19 also alleges that bank was negligent in permitting Foltz to personally pick up bank accounts.

EIT's brief. In that brief, EIT generally argues: "There is no question that a jury could conclude that multiple irregularities were ignored by bank that placed it on notice of Foltz's improper conduct" (EIT's brief at pg. 35). Among the "irregularities" alleged in bank's brief were the following:

- Bank allowed Foltz to personally pick up bank statements instead of sending them via the mail.

- Bucher did not apprehend that the funds being deposited in the bank account were public funds (Bucher N.T. 47).

- Bucher accepted Foltz's authority to sign on the bank account "as a matter of trust" (Bucher N.T. 56; 59).

- Bank's supervisory personnel should have noted and inquired about the lack of "completeness and accuracy" of EIT's corporate resolution.

- Bank should have taken note of the fact that Foltz wrote checks to himself from the public funds contained in the bank account.

Initially, we note that several of these so-called "irregularities" in the management of the bank account are actually reconstituted allegations of negligence regarding the opening of the bank account. For example, we consider the bank's failure to adequately proofread the corporate resolution and request additional verification to be part of the bank's alleged negligence in opening the bank account. With respect to those allegations that allege negligence in the opening of the bank account, we agree with EIT that a cognizable legal duty has been alleged.

On the other hand, no duty to manage the bank account exists as alleged by EIT. EIT has not referred us to any statutes or decisional precedent that impose a duty upon a bank to investigate and/or prevent ongoing embezzlement by an employee of one of its corporate customers. Rather, EIT refers to "traditional common law factors" that impose a duty as a matter of "fairness" (Pg. 27 of EIT's brief). Citing *Petrongolo v. Comcast-Spectacore, L.P.*, 789 A.2d 204 (Pa. Super. 2001), EIT alleges that bank owed it a duty because there was a "special relationship" between it and the bank, and because "the nature of the risk imposed, foreseeability of the harm incurred, social utility of the bank's conduct, consequences of imposing a duty upon the bank and overall public interest in the proposed solution all support a finding that the bank owed a duty to the bureau under the circumstances" (Pg. 31 of EIT's brief). With these broad proclamations, we disagree.

With one possible exception, bank's function after EIT's bank account opened was custodial and ministerial, not decisional.[4] With respect to processing of checks and deposits, bank owed EIT a duty of custodial integrity and ministerial accuracy. It did not owe a duty to audit or provide oversight with respect to the bank account.

We do not know precisely how many transactions bank processes. We assume that the number reaches into the thousands each and every business day. It would be

---

4. The possible exception involves the bank's decision to allow Foltz to personally pick up bank account statements instead of receiving them via mail. If in fact this practice was contrary to bank's routine practice - and we suspect that it was - bank's willingness to allow Foltz to personally pick up bank statements could be viewed as a non-ministerial decision. Even if this is the case, we note that EIT has not provided any expert testimony or other evidence that would deem the personal retrieval of bank statements to be negligent.

patently unreasonable to expect bank to monitor all of its customers in order to protect them from embezzlement. The realities and exigencies of the bank-depositor relationship require that once a bank account is opened, the risk of embezzlement is upon the depositor and not the bank. With respect to bank's largely ministerial post-opening function, we conclude that insufficient evidence exists for EIT's claim to survive summary judgment.

### (5) *Summary As To Duty*

We conclude that a financial institution such as bank does owe to its customers a duty to act with ordinary and reasonable care. Under Restatement of Torts (Second) § 299(a), bank's duty of ordinary care will be defined by examining how other banking institutions and bankers could have been reasonably expected to act under similar circumstances.

The scope of this duty and whether it was breached creates fact issues for a jury to decide.

With respect to the opening of the bank account, Mr. Greenberg's report and bank's own conduct in requiring a corporate resolution establishes to our satisfaction the need for bank to verify that the entity known as EIT consented to the opening of the bank account and Foltz's administration of it. Ample evidence exists that would allow a jury to determine that bank violated a duty of ordinary care by accepting a resolution that was not complete or signed by any member of EIT's committee. On the other hand, we view bank's actions after the bank account was opened to be custodial and ministerial in nature. As no evidence has been presented that bank violated any custodial or ministerial or custodial duty with respect to checks

and deposits, we will grant bank's motion for summary judgment as it relates to its conduct post-opening of the bank account.[5]

## B. *UNIFORM FIDUCIARIES ACT IMMUNITY*

Bank attempts to shield itself from liability by referencing Pennsylvania's version of the UFA. Under the terms of the UFA, a bank may avoid liability

> ...if any negotiable instrument, payable or indorsed to his principle, is indorsed by a fiduciary empowered to indorse such instrument on behalf of his principle, the indorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in indorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. 7 P.S. § 6372.

According to our Superior Court, "the UFA was designed to facilitate banking transactions by relieving the depository of the responsibility of seeing that an authorized fiduciary uses entrusted funds for proper purposes."

---

5. We note that the decision we have reached today is consistent with the decision rendered by Judge Samuel A. Kline with respect to bank's preliminary objections. In adjudicating arguments from bank that were slightly different than the ones proffered herein, Judge Kline concluded that EIT's "negligence claims stemming from bank's actual opening of the account may proceed under the common law" (Slip opinion at pg. 5). In his prior opinion, Judge Kline also declared that the claims of negligence against bank with respect to "taking Bureau's checks and depositing them into account" were governed by the UCC and not by common law. Today, we have taken Judge Kline's decision one step further and have dismissed EIT's claims of negligence regarding bank's ongoing management of bank account.

*Melley v. Pioneer Bank,* N.A., 834 A.2d 1191 (Pa. Super. 2003). However, "the UFA does not permit a bank to ignore an irregularity when it is of a nature to place one on notice of improper conduct by a fiduciary. In such a case, the good faith test would not be met." *Melley,* supra, at 1198. Essentially, the UFA relieves banks of any obligation to affirmatively investigate the legal viability of checks; it does not afford banks with free reign to don blindfolds and then escape liability for what could and should have been seen in the exercise of good faith.

As we read the UFA and the cases interpreting it, we find it to be consistent with our general conclusion that bank can be liable for negligence in the opening of EIT's account, but not with respect to the ongoing management of it. By its very terms, the UFA applies to "negotiable instruments" as they are paid or indorsed. See 7 P.S. § 6372; 7 P.S. § 6382. With respect to said negotiable instruments, "the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary..." 7 P.S. § 6382. Nowhere in the UFA is there language that immunizes a bank for negligence in the opening of a bank account. As a statute that limits liability in derogation of common law, the UFA must be interpreted strictly. See, e.g. 1 Pa.C.S.A. § 1928[6]. As such, we will apply the UFA as written. We will not extend the immunity granted by the UFA to an area - opening of a bank account - that is clearly beyond the expressed terms of the UFA.

Even if the UFA is deemed to apply to the opening of

---

6. The rule of statutory construction set forth at 1 Pa.C.S.A. § 1928 states that statutes enacted prior to September 1, 1937 that are in derogation of common law must be constructed strictly. The UFA was enacted in 1923. Thus, it falls within the category of statutes that must be construed strictly.

bank accounts, we would still decline to award summary judgment as requested by bank. In both *Melley*, supra and *Manfredi v. Dauphin Deposit Bank*, 697 A.2d 1025 (Pa. Super. 1997), our Superior Court stated: "The UFA does not permit a bank to ignore an irregularity where it is of a nature to place one on notice of improper conduct by the fiduciary. In such a case, the good faith test would not be met." *Manfredi* at pg. 1030; *Melley* at pg. 1198.

In this case, bank required a corporate resolution from EIT. When it received an improperly dated and incomplete form unsigned by any member of EIT's governing body, it could and should have been put on notice of an irregularity to which it should not have turned a blind eye. At a minimum, a jury issue has been created with respect to whether bank's acceptance of the defective EIT resolution constitutes "good faith" under the UFA. For this reason also, we will deny bank's motion for summary judgment based upon the UFA, at least to the extent that the motion for summary involves bank's conduct in opening EIT's bank account.

With respect to the allegations of EIT that bank mismanaged the bank account on an ongoing basis, we agree that the UFA provides immunity. As stated in *Robinson Protective Alarm v. Bolger and Picker*, 512 Pa. 116, 516 A.2d 299 (Pa. 1986), a bank's immunity for cashing a check "in good faith" is designed to promote the "smooth flow of commerce." *Id.* at pg. 304. If courts were to permit recovery from banks based upon a failure to monitor bank accounts to protect customers from fraud, this would inevitably create a banking process that would be much slower and more expensive. This could certainly jeopardize "the smooth flow of commerce."

We have already determined that bank owed EIT no post-bank account opening duty as alleged in paragraph 20 of the complaint. Even if we were to have declared that such a duty existed, we would find nevertheless that the UFA shields banks from liability based upon the theory set forth in paragraph 20. For this reason also, we will grant bank's motion for summary judgment as it relates to allegations of negligence with respect to bank's ongoing management of the bank account.

## C. *RESCISSION*

EIT has set forth a claim seeking rescission of the checks involved in Foltz's theft under 13 Pa.C.S.A. § 3306 of the UCC, which provides as follows:

§ 3306: Claims to an instrument

A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

Claims under § 3306 are governed by the notice requirements of 13 Pa.C.S.A. § 3307 which provides, in part, as follows:

§ 3307. Notice of breach of fiduciary duty

(b) General rule. -- If an instrument is taken from a fiduciary for payment or collection or for value, the taker has knowledge of the fiduciary status of the fiduciary and the represented person makes a claim to the instrument or its proceeds on the basis that the

transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

(1) Notice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person.

(2) In the case of an instrument payable to the represented person or the fiduciary as such, the taker has notice of the breach of fiduciary duty if the instrument is:

> (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary;

> (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary; or

> (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person.

(3) If an instrument is issued by the represented person or the fiduciary as such and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty.

Subsection (a) of § 3307 defines a "fiduciary" as "[a]n agent, trustee, partner, corporate officer or director or other representative owing a fiduciary duty with respect to an instrument." 13 Pa.C.S.A. § 3307(a).

"Represented person" is defined as "[t]he principal, beneficiary, partnership, corporation or other person to whom the duty stated under the definition of fiduciary is owed." *Id.*

EIT contends that § 3307 is inapplicable to this matter because no cause of action for breach of fiduciary duty is contained in the second amended complaint. However, the absence of such a claim is not determinative of the applicability of this provision. EIT has set forth a cause of action under § 3306 of UCC. Section 3307 applies to cases in which a represented person is asserting a claim because a breach by a fiduciary resulted in a misapplication of the proceeds of an instrument as described in § 3306. 13 Pa.C.S.A. § 3307, UCC Comment 2 - 1990. Foltz clearly falls within the definition of "fiduciary" as a director of EIT under §3307.

EIT argues that bank was a "taker" as contemplated by § 3306 and is therefore subject to the claims provided therein. Bank contends that it was not a "taker"; instead, that its dealings with these checks constituted "presentments" under § 3501 of the UCC. However, we need not address this issue here due to our finding that, even if bank was a "taker" within the meaning of § 3306, the notice requirements as set forth in § 3307 are applicable to this situation and preclude the pursuit of this cause of action against bank.[7]

Under § 3307(b)(3), bank (as a taker) would not have had notice of Foltz's breach of fiduciary duty unless the bank knew of the breach of fiduciary duty. Section 3307

---

7. We are more inclined to agree with bank that this was a "presentment" situation as defined in §3501, and that it was not a "taker" within the meaning of § 3306. Section 3501 defines "presentment" as "a demand made by or on behalf of a person entitled to enforce an instrument: (1) to pay the instrument made to the drawee or a party obliged to pay the instrument or, in the case of a note or accepted draft payable at a bank, to the bank; or (2) to accept a draft made to the drawee. Here, bank merely honored the checks (both those written by taxpayers and payable to EIT and those written by Foltz and payable to himself) upon submission by Foltz.

lists certain circumstances which give notice of a breach of fiduciary duty to a taker. Under § 3307(b)(1)(i) the instrument must be taken in payment of a personal debt of the fiduciary and the taker must possess such knowledge. This provision is inapplicable here as no debt of Foltz is alleged to have been paid with these funds. Likewise, § 3307(b)(1)(iii) is inapplicable as none of the checks were deposited in an account other than the account of the represented person, EIT.

Under § 3307(b)(1)(ii), the instrument must be taken in a transaction known by the taker to be for the personal benefit of the fiduciary. The terms "notice" and "knowledge" are defined in the UCC as follows:

Section. 1202. Notice; knowledge

(a) Notice. -- Subject to subsection (f), a person has notice of a fact if the person:

> (1)    has actual knowledge of it;
>
> (2)    has received a notice or notification of it; or
>
> (3)    from all the facts and circumstances known to the person at the time in question, has reason to know that it exists.

(b) Knowledge. -- "Knowledge" means actual knowledge. "Knows" has a corresponding meaning.

(c) Reason to know distinguished. -- "discover," "learn" or words of similar import refer to knowledge rather than to reason to know.

(d) Notify. -- A person notifies or gives a notice or

notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it.

(e) Be notified. -- Subject to subsection (f), a person receives a notice or notification when:

(1)     it comes to that person's attention; or

(2)     it is duly delivered in a form reasonable under the circumstances at:

(i)     the place of business through which the contract was made; or

(ii)     another location held out by that person as the place for receipt of such communications.

(f) Communication to organizations. -- Notice, knowledge or notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the

information.

EIT argues that bank possessed actual or constructive notice that Foltz had not been authorized to negotiate these checks on behalf of EIT. However, no evidence has been presented to support this contention. We agree with bank's position that the mere fact that Foltz was writing checks payable to himself is insufficient to attribute bank with notice or knowledge of Foltz' wrongdoing. As pointed out in bank's brief, this type of situation is discussed in Note 4 of the UCC comment to §3307:

> For example, Doe as President of corporation writes a check on corporation's account to the order of Doe personally. The check is then indorsed over to bank...In this case there is no notice of breach of fiduciary duty because there is nothing unusual about the transaction. Corporation may have owed Doe money for salary, reimbursement for expenses incurred for the benefit of corporation, or for any other reason. If Doe is authorized to write checks on behalf of corporation to pay debts of corporation, the check is a normal way of paying a debt owed to Doe. Bank may assume that Doe may use the instrument for his personal benefit. 13 Pa.C.S.A. § 3307, UCC Comment, n. 4.

In this case, Foltz did write checks to himself. However, bank had no duty to scrutinize EIT's checks in an effort to discern whether the payee was legitimate or not. As noted above, once a bank account is opened, the bank's duty is custodial and ministerial. Those duties did not require bank to provide auditing or oversight services to EIT. Therefore, we will not declare that bank possessed either actual or constructive notice of Foltz's payments to himself simply because those payments were conducted

via the bank account.

Rescission is another of the claims for which EIT seeks to impose liability for conduct of bank that post-dated the opening of bank account. Consistent with what we have already articulated, we will not be permitting EIT to pursue such claims. For the reasons outlined above, we will grant bank's motion for summary judgment with respect to EIT's claim of rescission.

## D. *UNJUST ENRICHMENT*

EIT's complaint sets forth a claim for unjust enrichment. Unjust enrichment requires the following elements:

(1) A benefit conferred upon the defendant by the plaintiff;

(2) Appreciation of such benefit by the defendant;

(3) Acceptance and retention of such benefit under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of value. *Stoeckinger v. Presidential Financial Corp.*, 948 A.2d 828, 833 (Pa. Super. 2008).

Unjust enrichment is an equitable remedy and must be viewed through the very broad prism that a court of equity enjoys.

Bank argues that no cause of action can be maintained for unjust enrichment. Bank states that it did not retain any of the money deposited by Foltz. Therefore, bank argues that the "benefit conferred" element of unjust enrichment does not exist (Bank's Brief at pg. 18). In addition, bank specifically points out that all funds remaining in EIT's account after discovery of Foltz's theft were returned to EIT (Exh. G).

In support of its arguments, bank cites the case of *Commerce Bank v. First Union National Bank*, 911 A.2d 133 (Pa. Super. 2006). Commerce bank involved a "check-kiting" scheme developed by mutual customer C.F. Foods that essentially shifted a risk of loss from First Union Bank to Commerce Bank. Noting that neither Commerce Bank nor First Union Bank actually "benefited" from this check-kiting scheme, the Superior Court rejected unjust enrichment as a potential theory of liability. Declaring that it was both "perplexed" and "un-persuaded," the Superior Court stated:

> Appellant cannot establish that First Union possesses any funds that rightly belong to appellant. At best, appellant established that C.F. Foods operated a check-kiting scheme that resulted in losses to appellant. If anyone possessed funds unjustly, it is presumably C.F. Foods. Appellant's discussion of "shifting the loss" is an interesting theoretical exercise, but it does not give rise to a viable cause of action for unjust enrichment. *Id.* at 144.

With respect to EIT's claim against bank for the entire $800,000 that Foltz deposited into bank account, we agree that no unjust enrichment claim exists. Bank did not retain or convert to its use the principle amounts that Foltz deposited into the bank account. As in *Commerce Bank*, supra, the chief beneficiary of Foltz's nefarious conduct was Foltz himself, not bank. Moreover, the roughly $80,000 that was left in the account upon discovery of Foltz's misconduct was returned by bank to EIT. To the extent that EIT seeks to use a theory of unjust enrichment to recover the entirety of the amount Foltz embezzled, we hold that EIT cannot do so under a theory of unjust

enrichment.

On the other hand, the $800,000 of EIT funds that were deposited into the bank account could and presumably did earn interest or investment income. If in fact the bank account should not have been opened in the first place as alleged by EIT, then the interest or investment income earned by bank on the funds deposited by Foltz should rightfully belong to EIT and not bank. To the extent that EIT can establish interest or investment income earned by bank on amounts deposited in the bank account, we will permit EIT to recover on a theory of unjust enrichment. Otherwise, we will not. Accordingly, we will deny bank's motion for summary judgment regarding unjust enrichment but will limit EIT's ability to recover based upon that theory as outlined above.

## E. *CONVERSION*

EIT's complaint sets forth a cause of action for conversion under the UCC. Section 3420 of the UCC does authorize a cause of action for conversion. That section reads:

> General Rule - The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-

payee. 13 Pa.C.S.A. §3420.

Unfortunately, the UCC does not define the term "conversion." Therefore, we look to decisional precedent for a definition of the term "conversion." "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification" *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. 1987). For the tort of conversion to exist, specific criminal intent is not required. However, the wrongdoer must possess "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights..." *Shonberger*, supra at pg. 114.

As simply as we can state it, this is not a conversion case. The record in this case is devoid of even a scintilla of evidence that bank converted funds of EIT for its own use and benefit. While negligence can legitimately be argued, there is simply no evidence whatsoever that bank exhibited the type of wrongful intent that is necessary for a conversion action. Therefore, we will not permit a jury to decide the issue of conversion. Bank's motion for summary judgment with respect to conversion will therefore be granted.

## F. *STATUTE OF LIMITATIONS*

Bank argues that EIT's claim for conversion must be considered time-barred by virtue of the three-year statute of limitations contained at 13 Pa.C.S.A. §3118(g)(1).[8] Bank thus argues: "In this case, Donald Foltz deposited checks into the PNC bank account between its opening in

---

[8]. Bank points out that the so-called "discovery rule" does not toll this particular statute of limitations. See *Hollywood v. First National Bank of Palmerton*, 859 A.2d 472, 482-83 (Pa. Super. 2004).

June of 2002 and the discovery of his misconduct in late 2006. The bureau may not recover for checks deposited prior to June 22, 2004, because the three-year statute of limitations has expired for those checks" (Bank's brief at pg.22).

By its very terms, 13 Pa.C.S.A. §3118(g)(1) applies only to a claim for conversion. In this preceding section of this opinion, we have determined that an action for conversion cannot be maintained under the facts of this case. Accordingly, bank's statute of limitations argument with respect to conversion has been rendered moot, and we will not address it any further.

### G. *BANK STATEMENT RULE*

The so-called "bank statement rule" is derived from 13 Pa.C.S.A. §4406(f). That section states:

(f) Statutes of limitations applicable to customer - Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under §4208 (relating to presentment warranties) with respect to the unauthorized signature or alteration to which the preclusion applies. 13 Pa.C.S.A. §4406(f).

The purpose of this section is to create a one-year time deadline for a customer to notify his or her bank of an unauthorized signature. *McMickle v. Girard Bank*, 515

A.2d 16, 17 (Pa. Super. 1986). As a precondition to taking advantage of this one year time limitation, a bank must have "made available" to the customer a statement of account. *McMickle*, supra.

Bank seeks to employ the bank statement rule as a defense against EIT's request to impose liability based upon bank's decision to eschew mailing of bank statements in favor of permitting Foltz to personally retrieve them. In its brief, bank states:

> The bureau is attempting to hold PNC Bank liable for allowing Foltz to pick up bank statements. This theory of liability presumes that the bureau would have reviewed bank statements, if provided. Indeed, the law imposes this duty. 13 Pa.C.S.A. §4406(c). Despite this theory, the bureau disregards the limitations period applicable when bank statements are provided. This position is not a legitimate one. The evidence demonstrates that PNC Bank demonstrated a maintenance request allowing Foltz to pick up bank statements after April 30, 2003 (Exh. E, Bucher Dep. at 74-75). Prior to that time, PNC Bank mailed bank statements to the bureau. Section 4406(f) bars the bureau from recovering the amounts identified in the bank statements mailed to the bureau. PNC Bank simply had no obligation to station itself in front of bureau's mailbox and protect the mail from bureau's own executive director (Bank's brief at pgs. 24-25; emphasis in original).

As between a customer and a bank, the bank statement rule allocates responsibility for discovering and reporting unauthorized signatures to the customer. We have already determined that bank owed EIT no duty to scrutinize checks in order to prevent fraud. The bank statement rule provides

additional support for our decision to grant bank's motion for summary judgment as it relates to alleged negligence in the management of bank account after it was opened. Therefore, bank's motion for summary judgment based upon the bank statement rule will be granted with respect to bank's post-opening management of bank account.

## H. *GIST OF THE ACTION DOCTRINE*

We confess that we were confused by bank's "gist of the action" argument. On the one hand, bank argued throughout its brief that EIT was nothing more than a "stranger" which had no contractual relationship with bank. Given this argument, we were surprised to read the following at page 25 of bank's brief:

> The legal relationship between a financial institution and its depositors is based on contract. Here, the bureau has itself pleaded a claim for breach of contract based upon the account opening documents. The Bureau therefore may not assert common law tort claims by the simple expedient of re-characterizing its causes of action. The "gist of the action" doctrine bars a plaintiff from asserting tort claims when its claims are based primarily on a contractual relationship. (Bank's brief at pg. 25).

In response to bank's "gist of the action" argument, EIT responds by boldly acknowledging that its claim is one "primarily based in negligence and not contract" (Pg. 44 of EIT's brief). EIT further acknowledges that "the duties that the bureau alleges were breached by the bank were not grounded in any contract, but rather are imposed through statutory law and through common law analysis of traditional duty elements" (EIT's brief at pg. 44).

From the outset of our analysis, we have viewed EIT as a customer of bank. Nevertheless, we have always recognized that EIT's primary claims were grounded in principles of negligence and not breach of contract. If there is a "gist of this action," it is clearly negligence and not breach of contract.

The gist of the action doctrine is designed to foreclose tort claims that arise "solely" from a contractual relationship between the parties. *Etol, Inc. v. Elias/Savion Advertising*, 811 A.2d 10 (Pa. Super. 2002). Because EIT has always presented this case as one of negligence, and because bank also employed much of its brief to disavow the existence of any contract between it and EIT, we would deem it particularly unfair to declare the "gist" of this action to be something that both parties agree it is not. Bank's motion for summary judgment based upon the "gist of the case" doctrine will also be denied.

## I. *ECONOMIC LOSS DOCTRINE*

Bank engages the ELD as a defense against EIT's claim of negligence. Bank cites what it calls a "general rule" that "economic losses may not be recovered in tort (negligence) absent physical injury or property damage." Bank's brief at pg. 27, citing *Spivack v. Berks Ridge Corporation*, 586 A.2d 402, 405 (Pa. Super. 1991). Bank posits "in this case, there has been no physical injury, and the bureau is therefore barred in recovering in tort" (Bank's brief at pg. 28).

Upon superficial examination, the ELD could appear to serve as a defense to EIT's claim of negligence. Language abounds in decisional precedent that purely economic loss should not be recovered in a negligence action. See, e.g.

*Spivack,* supra; *Margolis v. Jackson,* 543 A.2d 1238 (Pa. Super. 1989); *Debbs v. Chrysler Corporation,* 810 A.2d 137 (Pa. Super. 2002). However, as we examined the ELD and its public policy foundation with greater scrutiny, it became apparent to us that the ELD cannot and should not bar EIT's right of recovery against bank.

According to our research, the ELD was first articulated by the California Supreme Court in *Seely v. White Motor Company,* 403 P.2d 145 (Cal. 1965). It is worth noting that *Seely* applied ELD only to strict product liability torts. Even today, most states recognize that ELD is a doctrine that is best applied in the context of product liability law. In fact, the section on ELD contained in the Restatement (Third) of Torts is found within the chapter dealing with products liability law. See Restatement (Third) of Torts, § 21. Even more important, the state that first introduced ELD has largely abandoned it. In *J'aire Corp. v. Gregory,* 598 P.2d 60 (Cal. 1979), the California Supreme Court held that economic loss can be recovered in a negligence action when a "special relationship" exists between the parties and the loss should have been foreseeable to the defendant.

In Pennsylvania, our appellate courts have declared that "the purpose of the economic loss doctrine, as adopted in Pennsylvania, is maintaining the separate spheres of the law of contract and tort" *New York State Electric and Gas Corp. v. Westinghouse,* 564 A.2d 919, 925 (Pa. Super 1989). As articulated by our Superior Court, the public policy foundation of ELD "stems from the fact that the negligent actor has no knowledge of the contract or perspective relation and thus has no reason to foresee any harm to the plaintiff's interest." *Aikens v.*

*Baltimore and Ohio Railroad,* 501 A.2d 277, 279 (Pa. Super. 1985). In the case of *Adams v. Cooper Beach Townhouse Communities,* 816 A.2d 301 (Pa. Super. 2003), the Superior Court stated:

> The economic loss doctrine is concerned with two main factors: foreseeability and limitation of liability. As previously discussed, the economic loss doctrine is enforced to bar purely economic claims because the tortfeasor has no knowledge of the contract or prospective relation and, therefore, no reason to foresee any harm to plaintiff's interest. *Id.* at pg. 307.

Largely because of the aforementioned policy considerations underpinning ELD, its application has not been nearly as sweeping as bank claims. Most notably, professional negligence claims have been exempt from the limitations of ELD. For example, our appellate courts have held that purely economic loss can be recovered in attorney malpractice actions (*Gorski v. Smith,* 812 A.2d 683 (Pa. Super. 2002)), accounting malpractice actions (*Koken v. Steinberg,* 825 A.2d 723 (Pa. Cmwlth. 2003)) and architect malpractice cases (*Bilt-Rite Contractors v. The Architectural Studio,* 581 Pa. 459, 866 A.2d 270 (Pa. 2005)). In perhaps the strongest indictment of ELD, our Supreme court chose to use the following language when rejecting its applicability in *Bilt-Rite Contractors,* supra:

> Pennsylvania has long recognized that purely economic losses are recoverable in a variety of tort actions, including professional malpractice actions...we agree... that a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law. *Id.* at pg. 288.

From all of the above, we reach the following conclusions with respect to ELD:

(1) ELD has been most commonly applied in breach of contract and strict product liability litigation.

(2) The public policy foundation for ELD makes sense in the context of strict product liability and breach of contract cases; it does not make sense with respect to professional negligence claims.

(3) The clear trend among courts across the country is to limit and not expand the application of ELD.

(4) Pennsylvania's appellate courts have carved out a clear exception to ELD in cases involving professional negligence.

(5) The most recent pronouncement on ELD by our commonwealth's highest court has reinforced the limited nature of ELD and has emphasized that purely economic loss can be recovered in a "variety of tort actions."

(6) Foreseeability of loss is a key factor to be evaluated when assessing whether economic loss can be recovered in a tort action.

Given the above conclusions, we hold that the ELD does not bar EIT's claim of negligence with respect to the opening of the bank account. We view this case as a claim of professional negligence involving bankers and the banking industry. We find it foreseeable that losses as alleged by EIT could result from the type of negligence alleged against bank. Just as our appellate courts have permitted exceptions to ELD in other professional

negligence contexts, we believe that our appellate courts will not employ ELD to preclude EIT from recovering against bank.

Accordingly, bank's motion for summary judgment based upon ELD will be denied.

## J. CONTRIBUTORY NEGLIGENCE

Bank suggests that we can award summary judgment because of what it describes as EIT's "admitted negligence." Bank argues that Pennsylvania's Comparative Negligence Act is inapplicable because it applies on its face to actions "resulting in death or injury to person or property." See 42 Pa.C.S.A. § 7102(a). According to bank, this case does not involve "injury to person or property." Therefore, bank argues that the issues in this case "revert to the doctrine of contributory negligence, which bars recovery if the plaintiff's negligence has contributed in any way to the economic loss" (Bank's brief at pg. 30). Essentially, bank argues that even one percent of contributory negligence on the part of EIT will bar recovery (Bank's brief at pg. 30).

Without seriously debating bank's premise that traditional contributory negligence - not comparative negligence - governs this case, EIT argues simply that contributory negligence cannot be declared as a matter of law. EIT argues: "The bureau's common law tort claims are not barred by the doctrine of contributory negligence because the bureau was not required to guard against or anticipate the negligence of the bank..." (EIT's brief at pg. 48).

Even under traditional notions of contributory negligence, summary judgment must be reserved for only

"clear cases where the facts are indisputably fixed and there can be no reasonable doubt as to the inferences properly drawn from them." *Sargeant v. Ayers*, 358 Pa. 393, 57 A.2d 881, 883 (Pa. 1948). Whenever any doubt exists, the question of contributory negligence is a question of fact for the jury. *McIntyre v. Cusick*, 372 A.2d 864 (Pa. Super. 1977); *Heffernan v. Rosser*, 419 Pa. 550, 215 A.2d 655 (Pa. 1966).

At this stage of the proceedings, we decline to employ contributory negligence as a basis for summary judgment. We are aware that EIT will argue that its reliance on both Foltz and Faren was reasonable because neither Foltz nor Faren had given EIT any prior reason to suspect nefarious activity or negligent oversight. If in fact a jury agrees with EIT in this regard, it would be possible for EIT to avoid a finding of negligence.

We view the decision of EIT's negligence or lack thereof as one for a jury to determine. Because we decline to determine contributory negligence as a matter of law, we will be denying bank's motion for summary judgment.[9]

## VI. CONCLUSION

At the outset of this opinion, we called this dispute a "banking malpractice case." Even though a more technically correct moniker might be "professional negligence action involving bankers," we will stick with the more commonly used "malpractice" language as aptly

---

9. With the above being said, one of the issues for which we will solicit additional pre-trial briefs will be the issue of whether comparative or contributory negligence should govern at trial. Following receipt of those briefs, we will render a decision with respect to whether we will instruct the jury regarding concepts of contributory or comparative negligence.

describing this dispute. As we see it, a jury will have to decide this banking malpractice case.

To the best of our ability, we have attempted within this opinion to segregate EIT's claims that pertain to the opening of the bank account from those that do not. Our general goal has been to dismiss the latter and send the former to a jury trial. As we see it, a jury will have to focus upon the following paramount issues:

- Whether bank acted negligently in the opening of bank account by failing to adhere to the general standards that govern the opening of bank accounts for organizations such as ETI.

- Whether Faren was negligent for failing, inter alia, to provide proper auditing services for EIT.

- Whether EIT was itself negligent for failing, inter alia, to provide more dynamic oversight of Foltz.

- Whether or to what extent EIT suffered damages as a result of any negligence of bank and/or Faren.

To be sure, the parties and their lawyers have and will continue to identify other peripheral issues. However, the above represents the core of this dispute as we will submit it to a jury.

We recognize that we have today narrowed the focus of this litigation. We also recognize that the contents of this opinion may cause one or more parties to desire additional discovery. Therefore, we will extend the discovery deadline in the above-referenced case for a period of 120 days. Following the expiration of 120 days, we will undertake a scheduling conference to review the status of this matter. At that status conference, we will entertain a request for a

trial at a date certain.

Finally, the parties' legal submissions have piqued our interest with respect to one issue that will have to be resolved prior to a jury trial. One of bank's arguments is that traditional notions of contributory negligence will govern this case instead of more modern principles relating to comparative negligence. We understand this argument, but are not absolutely convinced that it is accurate. Unfortunately, EIT's brief largely ignored the substance of this argument and focused instead upon the procedural posture of this case. To assist us as we move forward toward trial, we will be directing that the parties provide additional legal argument to us with respect to the contributory versus comparative negligence question. Briefs on this issue are to be submitted on or before February 15, 2011.

An order to effectuate all of the decisions we have rendered today's date will be entered simultaneous with this opinion.

### ORDER OF COURT

And now, January 10, 2011, upon consideration of the defendants' motion for summary judgment and the parties' arguments with respect thereto, the order of this court is as follows:

1. The motion for summary judgment filed by Bank of Lebanon County, a division of BLC Bank, NA (hereafter "bank"), alleging lack of duty is granted in part and denied in part. As to plaintiff's allegations of negligence pertaining to the bank's opening of an account in plaintiff's name, the motion for summary judgment is denied. As to plaintiff's allegations of negligence regarding the bank's ongoing

management of plaintiff's bank account, the motion for summary judgment is granted.

2.   Bank's motion for summary judgment based upon the Uniform Fiduciaries Act is granted in part and denied in part. As to plaintiff's allegations of negligence with respect to the opening of the bank account in plaintiff's name, the motion for summary judgment is denied. As to plaintiff's allegations of negligence with respect to the ongoing management of said bank account, the bank's motion for summary judgment is granted.

3.   Bank's motion for summary judgment with respect to plaintiff's claim of rescission is granted.

4.   Bank's motion for summary judgment as to plaintiff's claim for unjust enrichment is granted in part and denied in part. To the extent that plaintiff seeks recovery of all principle amounts it alleges it lost, bank's motion for summary judgment is granted. To the extent that plaintiff's unjust enrichment claim seeks to recover interest or investment earnings on the money deposited with bank in plaintiff's name, the defendant's motion for summary judgment is denied.

5.   Bank's motion for summary judgment regarding plaintiff's conversion claim is granted.

6.   Bank's motion for summary judgment based upon the three-year statute of limitations on conversion claims is moot.

7.   Bank's motion for summary judgment based upon the bank statement rule is granted as it relates to plaintiff's claim that bank should have discovered and prevented the embezzlement of Donald Foltz.

8. Bank's motion for summary judgment based upon the "gist of the action" doctrine is denied.

9. Bank's motion for summary judgment based upon the economic loss doctrine is denied.

10. Bank's motion for summary judgment based upon contributory negligence is denied.

The intent of this court is to dismiss all of plaintiff's claims that relate to the bank's ongoing management of the bank account opened by Donald Foltz in plaintiff's name. Moreover, it is the intent of this court to conduct a trial on the issue of whether bank was negligent with respect to the opening of said bank account. To facilitate this decision, we issue the following additional orders:

1. The discovery deadline in the above-referenced matter is extended for a period of 120 days from the date of this order. Any party may conduct additional discovery and provide additional expert reports during this period of time.

2. Following the expiration of 120 days, any party may list this matter for a scheduling conference.

3. On or before February 15, 2011, the parties are directed to submit briefs to the undersigned regarding the issue of whether modern rules of comparative negligence or traditional rules of contributory negligence will apply to this case. Within these briefs, the parties are also directed to provide argument with respect to how the court should instruct the jury with respect to the negligence of bank, defendant Faren, Garcia and Garman and plaintiff.